# AMENDED

# EXHIBIT B

## Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   ------------------------------------------
 5   Angel Rosado,
 6
 7        Plaintiff,
 8
 9   vs.                Case Number 1:2017cv02210
10
11   Officer Abraham Mora et al.,
12
13        Defendants.
14   ------------------------------------------
15        Deposition of Abraham Mora
16                  Tuesday
17            April 17th, 2018
18
19                  -at-
20
21        Shiller Preyar Law Offices
22        601 South California Avenue
23            Chicago, Illinois
24
25
```

## Page 2

```
 1              APPEARANCES
 2
 3        For the Plaintiff:
 4        Tia L. Haywood
 5        Shiller Preyar Law Offices
 6        601 South California Avenue
 7        Chicago, Illinois 60612
 8
 9        For the Defendants:
10        Victoria R. Benson
11        Dortricia Penn
12        Allison L. Romelfanger
13        City of Chicago Department of Law
14        30 North LaSalle Street
15        Suite 900
16        Chicago, Illinois 60602
17
18        Also present:
19        Jonathan Apacible
20
21        RECORDER:  Good morning.  We are now on the
22   record.  Today is Tuesday, April 17th, 2018.  The time
23   is now 10:08 a.m.  We are located at Shiller Preyar Law
24   Offices, 601 South California Avenue, Chicago,
25   Illinois, for a deposition in the matter of Angel
```

## Page 3

```
 1   Rosado v. Officer Abraham Mora et al., case number
 2   1:2017cv02210.  The venue is Northern District of
 3   Illinois, Eastern Division.  The witness today is
 4   Officer Abraham Mora.  Officer Mora, my name is Lidia
 5   Gebrezgher.  I'm a notary public and I'm recording this
 6   deposition on behalf of Exhibit 5, LLC.  At this time,
 7   would you please raise your right hand for the oath?
 8        (Witness sworn)
 9        RECORDER:  Thank you.  Would the attorneys
10   please state their appearances for the record?
11        MS. HAYWOOD:  Tia Haywood on behalf of the
12   Plaintiff, Angel Rosado.
13        MS. ROMELFANGER:  Allison Romelfanger on
14   behalf of the Defendants.
15        MS. BENSON:  Victoria Benson on behalf of
16   Defendants.
17        MS. PENN:  Dortricia Penn on behalf of
18   Defendants.
19        RECORDER:  Would anyone else in the room
20   please state their appearance for the record?
21        MR. APACIBLE:  Officer Jonathan Apacible.        0:01:01
22        RECORDER:  Thank you.  Thank you that
23   completes the required -- required information.  We can
24   proceed.
25        MS. HAYWOOD:  Thank you.
```

## Page 4

```
 1              EXAMINATION
 2   BY MS. HAYWOOD:
 3        Q.  Good morning, Officer Mora.  I apologize for
 4   the delay.  Have you had your deposition taken before?
 5        A.  Yes.
 6        Q.  Okay.  Are you familiar with the ground
 7   rules?  I can go over them if --
 8        A.  It's been a while.
 9        Q.  -- you --
10        A.  So yeah --
11        Q.  Okay.
12        A.  -- if you would.
13        Q.  So if you require a break, I would just ask
14   that you wait before a question is pending.  Before you
15   take a -- take a break, I would just ask that you
16   answer the question and then you'll be free to take a
17   break, so just let me know.  If you don't understand a
18   question that I ask, you can just ask me to repeat it.
19   If you answer fully, I'll -- I'll be under the
20   influence -- well I'll believe that you have answered
21   the question correctly and understood the question
22   correctly.  So it's okay to just tell me -- ask me to
23   repeat it.  And your testimony here is being recorded,
24   but I will still ask that you will wait until I finish
25   asking a question before you answer.  I know sometimes
```

1  when you're casually speaking, you can anticipate the
2  answer, but I would just ask that if you will wait
3  until I finish the question, is that fair?
4     A.  Sure.                                    0:02:21
5     Q.  Okay.  And so I believe that is the -- pretty
6  much the ground rules.  So can you please state your
7  full name for the record and your star number?
8     A.  Mm-hmm.  Abraham Mora, M-o-r-a.  Star number
9  10636.
10    Q.  Okay.  And are you currently employed?
11    A.  Yes.
12    Q.  What is your current employment?
13    A.  I'm a police officer in the City of Chicago.
14    Q.  Okay.  How long have you been a police
15 officer?
16    A.  Approximately 15 years.
17    Q.  And what is your current age, may I ask?
18    A.  45.
19    Q.  Okay.  And had you had any other employment
20 prior to becoming a police officer?
21    A.  Yes.                                      0:03:12
22    Q.  What employment did you have?
23    A.  I was a high school teacher.
24    Q.  What high school did you teach at?
25    A.  Evanston Township.

1     Q.  How long were you a high school teacher at
2  Evanston Township?
3     A.  Approximately five years.
4     Q.  Okay.  And do you recall what year you joined
5  the Chicago Police Department?
6     A.  Yes.
7     Q.  What year was that?
8     A.  2003.
9     Q.  Do you recall what month?
10    A.  August.
11    Q.  You recall what day?
12    A.  I believe it was the 23rd.
13    Q.  Nice.  And you've been working for the
14 Chicago Police Department ever since, is that fair to
15 say?
16    A.  Correct.
17    Q.  And do you have any other employment aside
18 from the Chicago Police Department currently?
19    A.  Yes.                                      0:04:08
20    Q.  What employment is that?
21    A.  I'm the president of a security company.
22    Q.  Will you recall what the name of the security
23 -- well, do you know what the name of the security
24 company is?
25    A.  Mm-hmm.

1     Q.  What is it?
2     A.  Arms Security.  Arms, A-r-m-s.
3     Q.  Okay.  And when did you begin employment with
4  Arms Security Company?
5     A.  Approximately seven years ago.
6     Q.  Do you recall what date?
7     A.  I don't.
8     Q.  Okay.  Do you recall what year you started?
9     A.  To the best of my recollection, 2010.
10    Q.  Okay.  And do you recall what month?
11    A.  No.  I don't.                             0:04:56
12    Q.  Okay.  And what is your title at -- oh, I'm
13 sorry.  You mentioned before you're the president.
14 What is your responsibilities at the Arms Security
15 Company?
16    A.  Wide range of operational responsibilities.
17    Q.  Can you give me an example of your
18 day-to-day?
19    A.  Overseeing operations, finances, accounting.
20    Q.  Okay.  And when you are -- do you recall the
21 date that you started teaching at Evanston Township?
22    A.  The exact date?
23    Q.  To the best of your recollection.
24    A.  I don't recall the exact date.
25    Q.  Do you recall the month and year?

1     A.  I believe, to the best of my recollection, I
2  started in 1997.
3     Q.  Okay.  And do you recall the month?
4     A.  I don't recall the exact month.  No.
5     Q.  Okay.  Do you recall the month, the year that
6  you stopped working at the Evanston Township as a high
7  school teacher?
8     A.  I don't.                                  0:06:21
9     Q.  Okay.  And correct me if I'm wrong, are you
10 currently -- you are currently still employed with the
11 Arms Security Company, is that correct?
12    A.  Correct.
13    Q.  Okay.  Okay.  And had you attended any
14 secondary educational endeavors, I --
15        MS. ROMELFANGER:  Object to form.  You can
16 answer.
17    A.  Ever?  Are you asking --
18    Q.  Yes.
19    A.  -- me if I've ever?  Yes.  I have.
20    Q.  Okay.  What -- what secondary school have you
21 received?
22    A.  I received a graduate degree in education.
23    Q.  Do you recall what school you received that
24 from?
25    A.  Yes.                                      0:07:13

Page 9

1     Q. What school was that?

2     A. DePaul.

3     Q. DePaul. And any other degrees aside from the

4 graduate degree in education from DePaul?

5     A. A bachelor's degree.

6     Q. And where did you receive that -- that

7 bachelor's degree from?

8     A. Colorado State.

9     Q. And what did you major in for your bachelor's

10 degree?

11     A. Biology.

12     Q. Okay. Any other secondary educational

13 degrees, or certificates, or achievements?

14     MS. ROMELFANGER: Objection to form. You can

15 answer.

16     A. Not that I remember.

17     Q. Okay. And aside from the high school teacher

18 at Evanston, president of security at Arms Security

19 Company, and the -- a Chicago police officer, have you

20 had any other employment opportunities?

21     MS. ROMELFANGER: Objection to form. You can

22 answer.

23     A. In my lifetime or at -- at what time?

24     Q. To the best of your -- your knowledge.

25     A. Yes. I've -- I've had other jobs.

Page 10

1     Q. Can you recall what those other jobs were?

2     A. Yes.            0:08:29

3     Q. What were they?

4     A. I've been employed as a bar back, as a

5 security officer, I bagged groceries in high school at

6 a grocery chain.

7     Q. Do you recall what the grocery --

8     A. Been employed by a dry cleaners.

9     Q. Okay. Do you recall what that grocery chain

10 was?

11     A. Treasure Island.

12     Q. Treasure. Okay. And for any of these

13 employment opportunities, did you have to take a

14 polygraph?

15     A. No.

16     Q. Okay. And have you placed any other

17 employment applications currently?

18     A. Currently, no.

19     Q. Are you currently looking for any other

20 employment opportunities?

21     A. No.            0:09:39

22     Q. And would you classify your employment at the

23 -- as a president of Arms Security Company as part-time

24 or full-time?

25     A. Full-time.

Page 11

1     Q. Okay. Had you ever sought a promotion with

2 the Chicago Police Department?

3     A. Yes.

4     Q. What was the result?

5     MS. ROMELFANGER: Objection to form. You can

6 answer.

7     A. I didn't score high enough on the test.

8     Q. Had you retaken the test or -- had you

9 retaken the test?

10     A. No.

11     Q. Okay. And had you ever sought promotion with

12 the Arms Security Company since you began your

13 employment there?

14     A. No.            0:10:47

15     Q. And just to clarify, when you started your

16 employment around 2010 -- 2010, you started as the

17 president of the security company, is that correct?

18     A. Correct.

19     Q. Okay. And what is your current title with

20 the Chicago Police Department?

21     A. I'm a police officer.

22     Q. Okay. Do you have any social media accounts?

23     A. Yes.

24     Q. What social media accounts do you have?

25     A. LinkedIn.

Page 12

1     Q. Any others?

2     A. No.            0:11:34

3     Q. Okay. Do you own any domain names?

4     A. I do not personally own any domain names.

5 No.

6     Q. Ever written any blogs?

7     A. No. Not to my recollection, no.

8     Q. Okay. And this LinkedIn account, had you

9 ever posted anything or referred to anything regarding

10 this case, the Plaintiff, or the September 1st, 2015

11 incident?

12     A. No.

13     Q. Okay. Have any email addresses?

14     A. Yes.

15     Q. About how many?

16     A. Two.            0:12:33

17     Q. Had you ever had any correspondence through

18 email in regards to this case, the Plaintiff, Mr.

19 Rosado, or the September 1st, 2015 incident?

20     A. Outside of anything with my attorney?

21     Q. Yes. Outside of any privileged information

22 between you and --

23     A. No.

24     Q. -- Counsel?

25     A. No.

Page 13

1  Q. Okay. Do you have any family members in the
2  police department -- in the police force?
3  A. No.
4  Q. Okay. Okay. Are you assigned to any special
5  district or unit as a Chicago police officer?
6  A. I'm assigned to the gang investigations
7  division.
8  Q. And do you know what the purpose of the gang
9  investigations division is?
10  MS. ROMELFANGER: Objection to form. You can
11  answer.                              0:13:40
12  A. I don't know what the department policy's
13  purpose is or objectives, but I could give you my
14  opinion.
15  Q. Well what would you say your opinion is on
16  the gang investigations division's purpose?
17  A. Predominantly, to reduce crime and -- and
18  violent crime specifically related to gangs.
19  Q. And what would be -- what is your opinion on
20  how the -- the -- how the gang investigations divisions
21  accomplish that purpose?
22  MS. ROMELFANGER: Objection to form. You can
23  answer.
24  Q. I believe the -- the unit uses a number of
25  different investigative tools and strategies to

Page 14

1  accomplish that.
2  Q. What are some of those investigative tools or
3  strategies that the gang investigations division uses?
4  A. Surveillance, Title III investigations, COH
5  investigations, undercover operations, search warrants.
6  Q. Do you know what the COH abbreviation stands
7  for?
8  A. Yes.                              0:15:27
9  Q. What is it?
10  A. Consensual overhear.
11  Q. What is consensual overhear investigations?
12  A. A consensual overhear is a tool that is
13  essentially used by undercovers predominantly or
14  confidential informants, where they're given a court
15  order authorizing audio recording of conversations.
16  Q. Okay. Any other tools or strategies, aside
17  from what you just mentioned being the surveillance,
18  Title III investigations, COH investigations,
19  undercover, search warrants -- and search warrants?
20  MS. ROMELFANGER: Objection to form. You can
21  answer.                              0:16:25
22  A. I -- there are others. Those are a few.
23  Q. Any others that you can recall?
24  A. Reverse undercover purchases, pen register
25  investigations, jail interviews. Those are the ones

Page 15

1  that come to mind.
2  Q. Okay. Let's see. So you mentioned pen
3  register investigations, is that an acronym, pen?
4  A. Believe it is, but I'm not sure what -- what
5  the acronym stands for, if it is.
6  Q. Okay. You mentioned earlier about
7  surveillance, what type of surveillance does the gang
8  investigations division conduct?
9  MS. ROMELFANGER: Objection to form. Vague.
10  You can answer.
11  A. Again, a wide range of surveillance ranging
12  from electronic surveillance, video, to mobile
13  surveillance.
14  Q. And what would electronic surveillance
15  consist of?
16  A. Might be a video camera.            0:18:05
17  Q. And what would video surveillance consist of?
18  A. A video camera.
19  Q. What would mobile surveillance consist of?
20  A. Could be an officer -- a surveillance officer
21  in a vehicle.
22  Q. And is there any special methods for
23  surveillance with electronic versus video versus mobile
24  surveillance?
25  MS. ROMELFANGER: Objection to form and

Page 16

1  foundation. You can answer.
2  A. I think -- when I think of electronic
3  surveillance, it -- it could also include, I think,
4  things like a wiretap, as well as -- as video
5  surveillance.
6  Q. Okay. Let's see. And then what is the
7  purpose of the surveillance, to your knowledge?
8  MS. ROMELFANGER: Objection to form. Vague.
9  You can answer.
10  A. Purpose of a surveillance, I guess, would
11  depend on the -- the goal of the investigation.
12  Q. So then does the gang investigations division
13  only conduct surveillance on -- related to gang
14  activity?
15  A. No.                               0:19:52
16  Q. What other surveillance does the gang
17  investigations division conduct?
18  MS. ROMELFANGER: Objection to form. You can
19  answer.
20  A. It -- it could range from any -- any wide
21  range of violent crime, robbery offender, potential
22  robbery offenders, or suspected robbery offenders,
23  homicide offenders, to gang or narcotic activity.
24  Q. What would be your routine -- what would be
25  your routine in conducting narcotics surveillance?

1       MS. ROMELFANGER: Objection to form. Vague.
2   You can answer.
3       A.   Be hard to pinpoint a routine in -- in terms
4   of surveillance. Again, it would -- it would depend of
5   what the goals of what we're working on, you know, is
6   and what the investigation's goals are.
7       Q.   What are some goals that you have had in your
8   career where you decided to conduct narcotics
9   surveillance?
10      MS. ROMELFANGER: Objection to form. You can
11  answer.                              0:21:23
12      A.   Again, a wide range of goals ranging from
13  gathering intelligence about the individual we're --
14  we're surveilling to making an arrest.
15      Q.   And this gathering intelligence, is this a
16  one-time process typically, or is it typically a more
17  long process?
18      MS. ROMELFANGER: Objection to form. You can
19  answer.
20      A.   Again, it would depend on the goals of the
21  investigation.
22      Q.   Okay. So what are some examples of different
23  goals for investigations when you --
24      MS. ROMELFANGER: Object --
25      Q.   -- decide to conduct narcotics surveillance?

1       MS. ROMELFANGER: Objection to form. You can
2   answer.
3       A.   One example would be to conduct surveillance
4   to determine who the associates of somebody are.
5   Another example would be to conduct surveillance to
6   determine the source of narcotics for -- for that
7   individual. Another example might be to determine
8   where they live.
9       Q.   And how often does this narcotics
10  surveillance result in an arrest for you personally?
11      MS. ROMELFANGER: Objection to form. You can
12  answer.                              0:23:08
13      A.   I wouldn't be able to give you a number.
14      Q.   Do you have an estimate?
15      A.   Could you clarify a time frame?
16      Q.   Throughout your career with the Chicago
17  Police Department.
18      A.   It's -- it's hard to answer because it -- it
19  -- at -- at some points in my career, when I was -- for
20  example, when I wasn't in gang investigations, it was
21  more frequent. It's probably a lot less frequent in
22  gang investigations.
23      Q.   Why would you -- do you have an opinion as to
24  why it's more -- why it's less frequent with the gang
25  investigations division?

1       A.   I would say that the -- in gang
2   investigations, sometimes our -- our investigations,
3   our -- our goals would be to gather more intelligence
4   before arrests are made, mid to long-term
5   investigations.
6       Q.   Okay. When did you join the gang
7   investigations division?
8       A.   I don't recall the exact year, but it's
9   approximately ten years I've been in the unit, I
10  believe.
11      Q.   Okay. And as far as the officers -- I'm
12  sorry. Scratch that. Okay. And do you know how many
13  officers are in the gang investigations division?
14      A.   I don't know the exact number.
15      Q.   Are there any special teams in the gang
16  investigation unit?
17      MS. ROMELFANGER: Objection to form. You can
18  answer.                              0:25:39
19      A.   I'm not sure what you mean by "special."
20  There are a number of teams.
21      Q.   What are the types of teams that are in the
22  gang investigation unit?
23      A.   There are teams designated to certain areas
24  of the city, although we're able to conduct
25  investigations anywhere in the city, and sometimes they

1   reach into the suburbs, but.
2       Q.   Do you know -- were you assigned to a special
3   team to an area of the city -- certain area of City of
4   Chicago?
5       MS. ROMELFANGER: Objection to form. You can
6   answer.
7       A.   I'm assigned to a team, and typically, our
8   investigations are either on the West Side or the North
9   Side.
10      Q.   Do you know the boundaries of the West Side
11  and the North Side that you typically are assigned to?
12      MS. ROMELFANGER: Objection to form, to
13  extent it misstates prior testimony. You can answer.
14      A.   To my knowledge, there are -- we have no
15  boundaries.
16      Q.   Okay. Okay. And how many members are on
17  your team?
18      A.   Currently, six.
19      Q.   Do you know the names of all six of those
20  members on your team?
21      A.   Mm-hmm.
22      Q.   Can you tell me the names of the six members
23  on your team?
24      A.   Yes. Paul Heyden, Jon Apacible, Scott
25  Korhonen, Roberto Delcid, and Brian Leahy, and our

Page 21

1 sergeant.

2 Q. What's the name of your sergeant?

3 A. Frank Ramaglia. 0:28:01

4 Q. Okay. Okay. Have you ever witnessed police

5 misconduct?

6 MS. ROMELFANGER: Objection to form. You can

7 answer.

8 A. Could you clarify "misconduct"?

9 Q. Well what is misconduct to you?

10 A. Well misconduct could be a wide range of

11 things. Coming in late to work could be misconduct,

12 so.

13 Q. So had you ever witnessed any misconduct,

14 anything that you would consider misconduct?

15 MS. ROMELFANGER: Objection to form. You can

16 answer. 0:29:02

17 A. I haven't witnessed anything egregious that I

18 believed was worthy of noting.

19 Q. But it's fair to say you have witnessed

20 misconduct?

21 MS. ROMELFANGER: Objection to form. You can

22 answer.

23 A. Again, I guess it would -- you -- we would

24 have to define "misconduct."

25 Q. Okay. So you mentioned before that your

Page 22

1 definition of misconduct is possibly like coming in

2 late to work and other range of things, and my question

3 is had you ever witnessed misconduct? So I was -- so

4 just to clarify, it's fair to say you have witnessed

5 it, but you did not consider it egregious, is that fair

6 to say?

7 A. Well again, I'd like to define what

8 "misconduct" means.

9 Q. Okay. So what does "misconduct" mean to you?

10 A. Again, it could be a wide range of things.

11 Q. What's some examples of those things, aside

12 from the one you previously gave, coming in late to

13 work?

14 A. It could be somebody using a slang profanity

15 in an office.

16 Q. Anything else? 0:30:40

17 A. I mean, there's a wide -- that's why I'm

18 asking you what -- how you would define it because

19 there's -- there's such a wide range of things that

20 come to mind.

21 Q. Okay. So had you ever witnessed police

22 officers coming in late to work?

23 A. I probably have.

24 Q. Did you report that?

25 A. I don't believe so.

Page 23

1 Q. Okay. Had you ever witnessed any police

2 officers using slang or profanity in the office?

3 A. I may have.

4 Q. Did you report that?

5 A. I don't believe I did.

6 Q. Sorry. Do you consider -- strike that. Do

7 you consider excessive force police misconduct?

8 A. Yes. 0:31:40

9 Q. Had you ever witnessed any police officer

10 engage in excessive force?

11 A. No.

12 Q. Okay. Do you consider fabrication of

13 evidence misconduct?

14 A. Yes.

15 Q. Have you ever witnessed a police officer

16 fabricate evidence?

17 A. No.

18 Q. You ever witness any disorderly conduct by a

19 police officer?

20 MS. ROMELFANGER: Objection to form. You can

21 answer.

22 A. Can you elaborate on your question? Are you

23 -- are you -- are you asking me on duty, off duty --

24 Q. On duty or off duty?

25 A. -- at what time?

Page 24

1 MS. ROMELFANGER: Same --

2 A. Not to my recollection. I haven't.

3 Q. Okay. Aside from the ones that I've

4 mentioned, the ones that you mentioned -- mentioned,

5 can you think of any other -- any other conduct that

6 you consider misconduct?

7 A. No. 0:33:07

8 Q. Okay. Had you ever testified against a

9 police officer?

10 A. No.

11 Q. Okay. Had you ever been accused of lying?

12 MS. ROMELFANGER: Objection to foundation and

13 to form. You can answer.

14 A. At -- at any point in my life?

15 Q. Yes. 0:34:01

16 A. I don't recall the circumstance, but I'm

17 guessing I probably was accused at some point.

18 Q. Was -- were you ever accused of lying in

19 relation to your employment as a Chicago police

20 officer?

21 MS. ROMELFANGER: Objection to foundation.

22 You can answer.

23 A. I may have been.

24 Q. Do you recall what -- for what you were

25 accused of lying within -- regarding your employment as

Page 25

1 a Chicago police officer?
2     MS. ROMELFANGER: Objection to foundation.
3 You can answer.
4     A. I -- I don't recall if I was or not. I think
5 I answered I may have been.
6     Q. Okay. Had you ever lied on a job
7 application?
8     A. No.                    0:35:05
9     Q. In a job interview?
10     A. No.
11     Q. Are you aware of anyone who is of the opinion
12 that you are dishonest?
13     MS. ROMELFANGER: Objection to form and
14 foundation. You can answer.
15     A. I'm not aware of anyone. No.
16     Q. Okay. Do you like your job as a Chicago
17 police officer?
18     A. Most of the time, I do.
19     Q. What do you like most about your job?
20     A. I enjoy the camaraderie, solving problems,
21 working as a team with other individuals, accomplish
22 goals.
23     Q. What do you like least about your job as a
24 Chicago police officer?
25     A. Probably the stress at times.    0:36:40

Page 26

1     Q. Is there anything specifically that brings
2 about stress for you personally?
3     MS. ROMELFANGER: Objection to form. You can
4 answer.
5     A. Yeah. Long hours, having to work on our days
6 off or holidays sometimes can be stressful.
7     Q. Did you review any documents in preparation
8 for today?
9     A. Yes.
10     Q. What documents did you review?
11     A. I believe I reviewed the arrest report, a
12 supp report, grand jury testimony, court -- other court
13 documents. Believe that was it.
14     Q. Okay. Did you review any photos?
15     A. Not to my recollection, photos, no.
16     Q. Did you review any videos?
17     A. Yes.                    0:38:01
18     Q. How many videos did you review?
19     A. One.
20     Q. Do you recall what the content of that video
21 consisted of?
22     A. Yes.
23     Q. What was it?
24     A. It was the stop of Angel Rosado.
25     Q. Did you review any audio?

Page 27

1     A. I didn't review any audio. No.
2     Q. Anything else you can recall outside from the
3 things that you mentioned previously that you reviewed?
4     A. No.
5     Q. Okay. Had you had any conversations
6 regarding this lawsuit with any fellow officers, aside
7 from any conversations that you had in front of your
8 attorney?
9     A. Excuse me. Outside of attorney --
10     Q. Yes.                    0:39:26
11     A. -- meetings? No, other than we would have
12 had conversations the day of the arrest, but outside of
13 that and the attorney meetings.
14     Q. Do you recall what those conversations during
15 the date of the arrest consisted of?
16     MS. ROMELFANGER: Objection to form. You can
17 answer.
18     A. I don't recall the exact conversations we
19 had, but it was in regard to the incident and
20 processing paperwork.
21     Q. Do you recall who you specifically had any
22 conversations with, aside from -- outside Counsel, I'm
23 talking about the day of the incident?
24     A. I don't recall any specific conversations
25 that day.                    0:40:26

Page 28

1     Q. Do you recall who -- do you recall any
2 specifics of who you spoke with that day on September
3 1st, 2015?
4     A. Well I'm sure I spoke with members of my
5 team. I had a conversation with Mr. Rosado, family
6 members maybe. I don't recall others.
7     Q. When you say, "Family members," are those
8 your personal family members, are they family members
9 of Mr. Rosado, or family members of the other -- your
10 other fellow officers on your team?
11     A. Well you asked on that day, right?
12     Q. Yes.
13     A. Okay.
14     Q. On September 1st --
15     A. So yeah, it would have been mine probably. I
16 don't recall what they were, and we did -- I may have a
17 conversation with his brother, who I believe was with
18 him that day.
19     Q. Okay. Had you had any conversations
20 regarding this lawsuit with a wife, girlfriend, or
21 partner?
22     A. No.                    0:41:45
23     Q. And any conversations regarding this lawsuit
24 with any friends?
25     A. No.

Page 29

1    Q.  Had you had any conversations with any other
2  fellow officers, outside of Counsel, regarding this
3  deposition?
4    A.  No.
5    Q.  With a wife, girlfriend, or partner regarding
6  this deposition?
7    A.  No.
8    Q.  With any friends regarding this deposition?
9    A.  No.
10   Q.  Okay.  Did you speak with the wife -- strike
11 that.  Did you speak with a girlfriend or a partner
12 regarding the September 1st, 2015 incident?
13   A.  No.
14   Q.  Okay.  Did you speak with a wife regarding
15 the September 1st, 2015 incident?
16   A.  No.
17   Q.  Did you speak with any friends regarding the
18 September 1st, 2015 incident?
19   A.  No.                          0:42:55
20   Q.  Okay.  Had you taken any drugs or alcohol
21 within 24 hours of any of the three -- any of the
22 incident?
23   A.  No.
24   Q.  Did you take any drugs or alcohol within 24
25 hours of today?

Page 30

1    A.  No.
2    Q.  On the day of the September 1st, 2015
3  incident, who was your -- who were the members of your
4  team?
5    A.  The ones I recall were Paul Heyden, Roberto
6  Delcid, Scott Korhonen, Jon Apacible, Vincent
7  Baldassano, and myself.
8    Q.  Okay.  So -- how long have you known Officer
9  Paul Heyden?
10   A.  I believe when he first came to the gang
11 investigations unit, when I met him.  I don't recall
12 the exact date.
13   Q.  Recall the year?
14   A.  I don't.                      0:44:43
15   Q.  Do you recall for how long you believe -- can
16 you estimate around how long you believe you've known
17 him?
18   A.  To the best of my recollection, it's been --
19 it's over four years.
20   Q.  How about how long have you known Officer
21 Delcid?
22   A.  Again, same.  I met Officer Delcid when he
23 came to the gang investigations unit.  Whatever that
24 start date was is when I met him.
25   Q.  Is it fair to say it's over four years as

Page 31

1  well?
2    A.  I think it's less --
3    Q.  Okay.
4    A.  -- for -- for Officer Delcid.
5    Q.  Okay.  And how long have you known Officer
6  Korhonen?
7    A.  Again, I met Officer Korhonen in the -- when
8  I came to the unit, to the best of my recollection, so
9  it would be over seven or eight years.
10   Q.  How long do you know Officer Apacible?    0:46:03
11   A.  Same is true for -- for Officer Apacible.  I
12 would estimate around the same.
13   Q.  That was --
14   A.  Seven -- approximately seven years.
15   Q.  And how long have you known Officer
16 Baldassano?
17   A.  Same.  I don't recall when he came to our
18 team, but -- or when he came to the gang investigations
19 unit, but less than three years.
20   Q.  Okay.  Okay.  And had you ever socialized
21 with any of these officers on your team outside of
22 work?
23   A.  Yes.                          0:47:04
24   Q.  Which officers?
25   A.  All of the ones I mentioned.

Page 32

1    Q.  Had you ever met any of these -- the
2  officers' on your team family members?
3    A.  Yes.
4    Q.  Which officers?
5    A.  Officer Apacible, Officer Baldassano, Officer
6  Heyden, that's it.
7    Q.  Okay.  Oh, how long had you know the
8  sergeant, Frank Ramaglia?  Am I saying that correct?
9    A.  Excuse me.  Ramaglia.            0:48:17
10   Q.  Ramaglia.
11   A.  I met Frank when he became the sergeant of
12 our team.  Again, I don't recall the exact date, but --
13   Q.  Do you know the year?
14   A.  I don't.
15   Q.  Had you socialized with any of his family
16 members?
17   A.  I have.
18   Q.  Would you say it's often that you socialize
19 with the officers that you mentioned, being Apacible,
20 Baldassano, Heyden, and Frank Ramaglia?
21   A.  Can I -- can we go back to that last
22 question?
23   Q.  Sure.
24   A.  I'm sorry.  You said did I socialize with his
25 family members?

Page 33

1    Q. Yes.
2    A. I -- I would change --
3    Q. With -- well Frank Ramaglia.
4    A. Yeah. With Frank, okay. I thought --
5    Q. Okay.
6    A. -- you said with his family members. Were
7 you --
8    Q. Had you met --
9    A. Were you asking if I've socialized with him
10 or with his family members?
11    Q. Okay. So you were answering -- so just to
12 clarify, so you were answering in regards to that
13 you've socialized with Frank Ramaglia outside of work?
14    A. Okay. Yes. I have.
15    Q. Okay.
16    A. I thought --
17    Q. Had you --
18    A. -- you asked about his family.
19    Q. Had you met his family?
20    A. I've met his family. Yes.        0:49:36
21    Q. Okay. Probably done for that. How often
22 would you say you socialized with these -- the officers
23 on your team outside of work?
24    A. Infrequently.
25    Q. Were you ever disciplined in high school?

Page 34

1        MS. ROMELFANGER: Objection to form. You can
2 answer.
3    A. Not to my recollection.
4    Q. Were you ever disciplined in college?
5        MS. ROMELFANGER: Objection to form. You can
6 answer.
7    A. To the best of my recollection, no.
8    Q. Were you ever disciplined in graduate school?
9        MS. ROMELFANGER: Objection to form. You can
10 answer.
11    A. No.                    0:50:40
12    Q. Had you had any special trainings on
13 narcotics surveillance?
14    A. Yes.
15    Q. Do you recall what trainings those were?
16    A. I recall an initial training prior to
17 entering the unit, which involved training for
18 surveillance. There was a -- an additional course, I
19 -- I forget the name of it, that was -- involved
20 surveillance training. There was a training given by
21 the FBI, FBI surveillance course that I was a part of.
22 Those are the ones that come to mind.
23    Q. Is there any -- was there any separate
24 training for gang surveillance?
25    A. I'm -- well those would all be in relation to

Page 35

1 -- or for what we do in the unit.
2    Q. Okay. Any special trainings on searches for
3 narcotics?
4    A. The only ones I recall are what we had in the
5 academy.
6    Q. Okay. What is the first thing that typically
7 occurs when you are on surveillance for narcotics
8 activity?
9        MS. ROMELFANGER: Objection to form. Vague.
10 You can answer.
11    A. Can you restate the question?        0:52:30
12    Q. What is the first thing that typically occurs
13 when you are on surveillance for narcotics activity?
14        MS. ROMELFANGER: Same objection.
15    A. The first thing that would occur would be to
16 determine a goal of the surveillance or the area and or
17 persons that would -- we might be conducting
18 surveillance on.
19    Q. And then once you determine the goals, the
20 area, and the persons, what would you do after that
21 typically?
22        MS. ROMELFANGER: Objection to form. Vague.
23 You can answer.
24    A. Typically, the next step would be to get in
25 my vehicle if I'm conducting surveillance. So your --

Page 36

1 your question, right, if I'm conducting it?
2    Q. Yes.                    0:53.33
3    A. Get in -- get in a covert vehicle and surveil
4 that -- that area.
5    Q. Okay. And is there any special or separate
6 purpose for surveillance for gang activity?
7        MS. ROMELFANGER: Objection to form and
8 foundation. You can answer.
9    A. I'm not sure I understand the question. Can
10 you repeat it?
11        MS. HAYWOOD: Can you repeat the question?
12        (Record replayed)
13        MS. ROMELFANGER: Same objection.        0:54:52
14    A. I -- I -- there's -- there's a purpose of
15 surveillance, but in -- in regard to it being connected
16 to gang activity, I'm not sure -- I guess I'm not clear
17 on your question.
18    Q. Okay. So you discussed surveillance for
19 narcotics activity, my question is, is there either a
20 separate or special purpose for surveillance for gang
21 activity?
22        MS. ROMELFANGER: Objection to form and
23 foundation. You can answer.
24    A. I don't think there's a special purpose for
25 -- for all gang activity surveillance. It would depend

1 on, again, the goals of the investigation, the daily
2 operational goals, all those things.
3   Q.  Okay.  Are you aware of any special policies
4 or protocol for gang surveillance?
5     MS. ROMELFANGER: Objection to foundation.
6 Not here as a 30(b)(6).  You can answer.
7   A.  There are some policies related to
8 surveillance, covert surveillance.  Specifically for
9 gang surveillance, I'm not sure those are defined that
10 way in our policies, but I -- there are some related to
11 surveillance.
12   Q.  Okay.  Are you familiar with any policies or
13 protocol for narcotics surveillance?
14     MS. ROMELFANGER: Objection to foundation,
15 and he's not here as a 30(b)(6).  You can answer.
16   A.  Again, I'm -- I'm aware of some department
17 policies surrounding covert surveillance, nothing
18 specific to narcotic surveillance.
19   Q.  Okay.  And the -- you're on the gang
20 investigation unit 193, is that correct?
21   A.  Correct.                    0:57:16
22   Q.  And what are your specific responsibilities
23 on the gang investigation unit 193?
24   A.  I don't that they're defined anywhere, but
25 typically, my responsibilities include surveillance,

1 state's attorney and the judge first, and then they
2 keep a copy, and then we -- we keep it in our unit.  It
3 goes to an administrative person.
4   Q.  Okay.  Had you ever -- had you ever
5 participated in a warrant for searching -- in a search
6 warrant?
7   A.  Yes.                        1:00:13
8   Q.  How many would you say over your career that
9 you've participated in?
10   A.  Over my career, I couldn't give you a number,
11 but I've participated in, I would estimate, hundreds.
12   Q.  And how many of those hundreds would you say
13 were specifically related to narcotics?
14   A.  I couldn't give you an exact number, but
15 typically, they're either narcotics or firearms.
16   Q.  Okay.  And how many of those warrants would
17 you say you have been the affiant for?
18   A.  Again, I couldn't give you an exact number,
19 but I would guess over 200.
20   Q.  And how many of those would you say dealt
21 with narcotics?
22   A.  Again, I couldn't give you an exact number,
23 they're -- typically, they're narcotics or firearms,
24 but the percentages of -- of which, I couldn't --
25 wouldn't want to give you a bad estimate.

1 undercover work, writing affidavits, completing
2 reports.
3   Q.  Is there any special trainings or
4 requirements that qualify you to be on the gang
5 investigation unit?
6     MS. ROMELFANGER: Objection to foundation.
7 You can answer.
8   A.  Believe the department policy is a minimum of
9 five years to enter the -- the unit.
10   Q.  Okay.  You mentioned before about writing
11 affidavits, are those affidavits -- what are those
12 affidavits for?
13     MS. ROMELFANGER: Objection to form.  You can
14 answer.                          0:58:38
15   A.  Typically, they're related to investigations
16 that our team is involved with.
17   Q.  Do you have to turn in those affidavits, or
18 what do you do with those affidavits?
19     MS. ROMELFANGER: Objection to form.  You can
20 answer.
21   A.  Yeah.  We -- we turn them in at some point.
22 It depends if it's a confidential investigation or
23 short-term investigation.  It would depend.
24   Q.  Who would you turn them in to?
25   A.  Well typically, they would get signed by the

1   Q.  Okay.
2     MS. ROMELFANGER: Tia, can we take a quick
3 break?
4     MS. HAYWOOD: Yes.             1:01:53
5     RECORDER: Off the record, 11:10 a.m.
6       (Off the record)
7     RECORDER: Back on the record, 11:21 a.m.
8   Q.  Okay.  So Officer Mora, you ever deal with
9 any confidential informants in regards to narcotics
10 surveillance?
11   A.  Yes.
12   Q.  How many times over you -- the course of your
13 career as a Chicago Police Department -- police
14 officer?
15   A.  I don't recall the exact number of times.
16   Q.  Do you recall the number of confidential
17 informants that you work with?
18     MS. ROMELFANGER: Objection to form.  You can
19 answer.
20   A.  I don't.  I don't recall the exact number.
21   Q.  Okay.  And what would be the purpose in your
22 use of a confidential informant in regards to narcotics
23 surveillance?
24     MS. ROMELFANGER: Objection to form.  You can
25 answer.                          1:02:57

1  A.  Well I guess in -- in terms of narcotics
2 surveillance, we would use -- typically, we would use
3 informants to gather information that might -- might be
4 useful during the surveillance.
5  Q.  How about use of a confidential informant for
6 gang surveillance?
7  MS. ROMELFANGER:  Objection to form.  You can
8 answer.
9  A.  I would say it would be the same -- the same
10 use of informants for information related to the
11 surveillance.
12  Q.  Okay.  How do you procure a confidential
13 informant?
14  MS. ROMELFANGER:  Objection to form.  You can
15 answer.
16  A.  I've come to work with informants different
17 ways, ranging from individual -- random individuals
18 approaching a police station or approaching me, to
19 proffering an arrestee.
20  Q.  Any other way aside from the one that you
21 just mentioned?
22  A.  Again, there's -- there's a wide range of
23 ways that it -- it could happen.  The way it's -- are
24 you asking me ways that I've procured --
25  Q.  Yes.                    1:04:36

1  A.  -- CIs?  Those two, and there are -- we -- we
2 have a tool that we sometimes are able to utilize where
3 we would essentially ask an individual if they wanted
4 to be cooperative.
5  Q.  Would anything be promised to that individual
6 in exchange for them becoming a confidential informant?
7  A.  No.
8  Q.  Any other ways?
9  A.  Well -- go back to that.  So --
10  Q.  Okay.
11  A.  -- if someone is a registered informant, they
12 could be paid through the city or the federal
13 government, so I guess you might say that they're
14 promised -- they could be promised money, in certain
15 circumstances, if they're registered, they qualify for
16 that.
17  Q.  Okay.  Any other thing that an informant
18 could be promised aside from money?
19  MS. ROMELFANGER:  Objection to form.  You can
20 answer.
21  A.  No.                    1:05:58
22  Q.  Okay.  And what's the difference between a
23 registered and a non-registered -- how -- a
24 confidential informant?  I'm sorry.
25  A.  Well a registered informant is somebody who's

1 established their credibility and is then, essentially,
2 confidentially documented either with the department or
3 maybe with the federal government.
4  Q.  And then unregistered?
5  A.  Unregistered would just be a -- you know, a
6 cooperative individual that's not officially
7 registered, but provides intelligence or information.
8  Q.  So is it fair to say the registered
9 confidential informant is used multiple times?
10  A.  Be hard to make a general statement on that.
11 Sometimes they are.
12  Q.  Okay.  And is it fair to say that the
13 unregistered confidential informant is used only once?
14  A.  Again, it would depend on the informant.    1:07:40
15  Q.  Okay.  Can you describe the process for
16 booking an arrestee?
17  MS. ROMELFANGER:  Objection to form.
18 Foundation.  You can answer.
19  A.  So for people in our unit, or --
20  Q.  Yes.
21  A.  -- any police officer, or --
22  Q.  For your unit.
23  A.  Okay.  Typically, we bring individuals to
24 Homan Square and complete paperwork.  After the
25 paperwork is completed, they are then transported to,

1 typically, the 11th district for further processing,
2 and that's -- that's the holding facility.
3  Q.  Okay.  Do you recall was that the booking
4 process for Mr. Rosado on September 1st, 2015?
5  A.  Yes.                    1:09:06
6  Q.  Okay.  To your knowledge, has any person ever
7 claimed you fabricated evidence?
8  A.  Not to my knowledge.
9  Q.  To your knowledge, has any person ever
10 claimed any of the other police officers on your team,
11 specifically Heyden, Baldassano, Apacible, Delcid, or
12 Korhonen, fabricated or planted evidence?
13  A.  Not to my knowledge.
14  Q.  Were you ever disciplined for misconduct as a
15 police officer?
16  MS. ROMELFANGER:  Objection to form.  You can
17 answer.
18  A.  I've been disciplined by the department.
19 Yeah.
20  Q.  Do you recall what that discipline was in
21 regard to?
22  A.  Yes.                    1:10:06
23  (Confidential portion of transcript begins)
24
25  *CONFIDENTIAL PORTIONS REDACTED*

Page 45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*CONFIDENTIAL PORTIONS REDACTED*

Page 47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*CONFIDENTIAL PORTIONS REDACTED*

Page 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*CONFIDENTIAL PORTIONS REDACTED*

Page 48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*CONFIDENTIAL PORTIONS REDACTED*

Exhibit 5, LLC

Page 49

1
2
3
4
5
6
7
8      (Confidential portion of transcript ends)
9    Q.  Okay.  Have you ever been a party to a
10   lawsuit?
11   A.  Yes.
12   Q.  Do you recall where those lawsuits occurred
13   or lawsuit?
14      MS. ROMELFANGER:  Objection -- objection to
15   form.  You can answer.
16   A.  Are you asking party to a lawsuit related to
17   the police department?
18   Q.  Yes.
19   A.  Yes.
20   Q.  Where did --
21   A.  I don't recall -- and your question was where
22   did they occur?
23   Q.  Yes.
24   A.  I -- can you clarify the question?
25   Q.  So the lawsuits that you've been involved in
        *CONFIDENTIAL PORTIONS REDACTED*

Page 50

1    in regards to the Chicago Police Department, were they
2    -- is it fair to say they all were in Chicago?
3    A.  To the best of my recollection, the -- the
4    lawsuits were filed in -- in Cook County, to the best
5    of my recollection.  I don't -- you're asking me about
6    the incidents that led to them?
7    Q.  Yes.                            1:19:47
8    A.  To the best of my recollection, most of them
9    occurred in the city.
10   Q.  Okay.  Do you recall the names of the
11   plaintiffs of the lawsuits?
12   A.  I recall some of them.
13   Q.  What are their names?
14   A.  I recall Rosado, Mr. Rosado.  I recall one
15   from Mr. Pizarro, one from Perez, I believe, and a
16   Lewis.  Those are the ones I recall.
17   Q.  Do you recall the years for Pizarro?
18   A.  I don't recall the year.
19   Q.  Do you recall the year for Perez?
20   A.  I don't.                        1:20:50
21   Q.  Do you recall the year for Lewis?
22   A.  The -- the year they were filed or --
23   Q.  Yes.
24   A.  I don't.
25   Q.  Do you recall the result for any of the

Page 51

1    lawsuits that you previously mentioned?
2    A.  To the best of my knowledge --
3    Q.  Yes.
4    A.  -- I -- I believe they were dismissed, except
5    for Rosado is ongoing, but I believe they were all
6    dismissed.
7    Q.  Okay.
8    A.  The ones I mentioned, those are the ones --
9    there may be others, but those --
10   Q.  Okay.
11   A.  -- are the ones I recall.
12   Q.  Had you ever had to pay punitive damages?
13   A.  No.
14   Q.  Okay.  Had you ever had a judgment entered to
15   you -- against you in any of these cases, aside from
16   Rosado, which is pending?
17   A.  No.                            1:22:03
18   Q.  Okay.  And have you ever testified in court?
19   A.  Yes.
20   Q.  Which court would you typically testify in,
21   would you say?
22   A.  Throughout my career?
23   Q.  Yes.
24   A.  26th and California, Grand and Central,
25   Branch 50, testified at Skokie.

Page 52

1    Q.  Okay.  And how often would you say you
2    testify?
3    A.  During what time frame?
4    Q.  During your career as a Chicago police
5    officer.
6    A.  It's become less frequent.  Be hard to give
7    you a number.
8    Q.  Okay.  Well can you give me an estimate?
9    A.  I would say for the -- for over the last
10   year, approximately -- how many times did I testify or
11   go to court?
12   Q.  Testify.                       1:23:34
13   A.  I would say approximately ten to 15 times
14   over the year.
15   Q.  You ever testified at federal court?
16   A.  I have not.
17   Q.  You ever testify at any of these courts
18   against a fellow officer?
19   A.  No.
20   Q.  Okay.  And do you recall when you've
21   testified for these Grand and Central, 26th and
22   California, or Skokie, any specifics?
23      MS. ROMELFANGER:  Objection to form.  You can
24   answer.
25   A.  I don't recall specific dates.  I'd have to

Page 53

1  review notifications.
2     Q.  Okay.  And what -- what typically is the
3  purpose for your testimony in the -- at the courts that
4  you mentioned before?
5        MS. ROMELFANGER:  Objection to form.  Vague.
6  You can answer.  Foundation.
7     A.  It would depend.  Branch 50 is typically a
8  probable cause hearing.  26th and Cal would typically
9  be testifying for a motion or a trial, maybe a grand
10 jury.
11    Q.  Okay.  Had you ever been charged with a crime
12 before?
13    A.  In my lifetime?
14    Q.  Yes.                            1:25:30
15    A.  Yes.
16    Q.  What crime were you charged with before?
17    A.  Ammunition without FOID.
18    Q.  Do your recall what the result of that charge
19 was?
20    A.  It was dismissed.  Expunged.
21    Q.  Do you recall when you received that charge
22 for that crime?
23    A.  I don't recall the exact -- the year.  It was
24 over 15 years ago.
25    Q.  Do you recall where you were when you

Page 54

1  received the charges for that crime?
2     A.  Yes.
3     Q.  Where were you?
4     A.  Where I was arrested?
5     Q.  Yes.
6     A.  In my residence at the time.
7     Q.  And where was your residence located at, at
8  the time?
9     A.  I don't recall the exact address, but it was
10 near Fullerton and Damen.
11    Q.  Oh, I was just saying was it in Chicago?
12    A.  Oh, yeah.  Yeah.
13    Q.  Okay.
14    A.  It was an apartment in Chicago.
15    Q.  Okay.  Okay.  So that will be yes.  Have you
16 ever been convicted of any crime?
17    A.  No.                            1:26:56
18    Q.  Okay.  Do you have a perspective on lawsuits
19 against police officers in general?
20    A.  In general?
21    Q.  Yes.
22    A.  Not in general.  I think it's -- it's part of
23 our job.
24    Q.  Okay.  Do you think it's too easy to file a
25 lawsuit?

Page 55

1     A.  Perhaps, but it's how our system works.  So I
2  -- I accept that.  I understand that.
3     Q.  Okay.  Do you think lawsuits are impacting
4  good police work?
5     A.  Overall, it may at times.
6     Q.  Do you think that lawsuits are impacting your
7  police work?
8     A.  I don't.                       1:28:09
9     Q.  Does it bother you that you're being sued?
10    A.  It doesn't.  I don't enjoy it, but it's part
11 -- like I stated, it's part of our job.  I've come to
12 understand that.
13    Q.  Have your read the complaint in this case?
14    A.  Yes.
15    Q.  Do you read all complaints filed against you?
16    A.  Typically, I would.  Yes.
17    Q.  Is there anything you did during the
18 investigation that led to this search and arrest in
19 this lawsuit that you regret?
20    A.  No.
21    Q.  Is there anything you have ever done on a job
22 that you regret --
23        MS. ROMELFANGER:  Objection --
24    Q.  -- as a police officer?
25        MS. ROMELFANGER:  I'm sorry.  Objection to

Page 56

1  form.  You can answer.
2     A.  I don't know if "regret" is the word that I
3  would use, but I've made mistakes as a police officer
4  and --
5     Q.  Okay.  Sorry.  Had you ever been to 4710
6  South Wallace prior to September 1st, 2015?
7     A.  No.                            1:29:47
8     Q.  Had you -- have you been there since?
9     A.  No.
10    Q.  Had you ever been to the area of Diversey and
11 Monticello prior to September 1st, 2015?
12    A.  I've been to the area.  Yes.
13    Q.  How many times would you say?
14    A.  I couldn't give you a number.
15    Q.  How about an estimate?
16    A.  Many times.  I worked in that area for
17 several years when I first started as a police officer,
18 so.
19    Q.  When you first started as a police officer,
20 were you assigned to a district?
21    A.  I was first assigned to the 14th district.
22    Q.  Any other districts after that?
23    A.  I was also assigned to the area five
24 saturation team.
25    Q.  What is the area five saturation team?     1:30:51

1    A.    At the time, that encompassed all the
2 districts within area five, no longer area -- called
3 area five, but -- and it was a team that essentially we
4 could patrol and conduct investigations in -- in those
5 areas.
6    Q.    What were the districts that were within area
7 five?
8    A.    I believe it was the 25th district, the 14th
9 district, 17, 16, and -- 17, 16, there's one other, but
10 I can't recall what that was. 15 maybe.
11    Q.    Okay. So first, you were in the 14 district,
12 and then you went to area five saturation team, any
13 other districts or teams after that?
14    A.    After the -- after the saturation team, I
15 went to 14th district gang team.
16    Q.    Uh-huh. I'm sorry.
17    A.    And then that was renamed gang enforcement
18 unit, and then from there, gang investigations.
19    Q.    Okay. Have you been in the area of Diversey
20 and Monticello since September 1st, 2015?
21    A.    I have been in the area. Yes.            1:32:49
22    Q.    Do you recall how many times, after September
23 1st, 2015, you've been in the area of Diversey and
24 Monticello?
25    A.    I don't recall the exact number.

1    Q.    An estimate?
2    A.    I've driven through there at least a handful
3 of times since 2015.
4    Q.    So what was your role in the search and
5 arrest of Mr. Rosado on September 1st, 2015?
6    A.    Well I had no role in searching or arresting
7 him. You -- you mean the physical arrest of him,
8 right?
9    Q.    Yes.                              1:34:05
10    A.    Yeah.
11    Q.    Okay. How did you come to know about Mr.
12 Rosado on September 1st, 2015?
13    A.    Well through our -- our short investigation
14 and surveillance, we apprehended an individual that I
15 later learned to be Mr. Rosado.
16    Q.    So you mentioned there was a -- it was a
17 short investigation, was there any briefing done prior
18 to your observation -- I mean, or surveillance of Mr.
19 Rosado on September 1st, 2015?
20    MS. ROMELFANGER: Objection to form. You can
21 answer.
22    A.    Can you clarify "briefing"?
23    Q.    Well what does a -- what does a briefing
24 consist of you?
25    A.    Wide range of -- of possibilities. On that

1 day, I'm sure, at some point, I communicated to
2 teammates that I was going to conduct surveillance and
3 look around the area of Diversey and Monticello.
4    Q.    Were you alone on that day, on September 1st,
5 2015?
6    MS. ROMELFANGER: Objection to form. You can
7 answer.                              1:35:47
8    A.    I was working with team members, but I was
9 physically alone in a -- in a vehicle.
10    Q.    Okay. Had there been any formal meeting
11 between you and your team members in regards to the
12 surveillance on Diversey and Monticello?
13    A.    I don't recall any formal meeting.
14    Q.    Was there an informal meeting with any of
15 your team members in regards to you conducting
16 surveillance on Diversey and Monticello?
17    MS. ROMELFANGER: Objection to form. You can
18 answer.
19    A.    Again, I need to clarify what an informal
20 meeting is, but I -- I would, again -- we -- I
21 communicated to them. So if you -- if you classify
22 that as a meeting. Where that took place, I don't
23 recall, but at some point, I communicated to them my
24 intentions.
25    Q.    Did you have any information on Mr. Rosado

1 specifically on September 1st, 2015?
2    A.    No. Prior to his arrest?
3    Q.    Yes.                              1:37:26
4    A.    No.
5    Q.    Okay. Did you have any information
6 specifically on Mr. Soliveras on September 1st, 2015?
7    A.    Prior to his arrest, I did not.
8    Q.    Okay. Were you the one who initiated the
9 surveillance for -- on September 1st, 2015, on Diversey
10 and Monticello?
11    A.    Yes.
12    Q.    Do you recall for what purpose you wanted to
13 conduct surveillance on -- in the area of Diversey --
14 Diversey and Monticello on September 1st, 2015?
15    A.    I think the purpose was to gather
16 information. It's a known gang and narcotics area that
17 I have experience with, and basically, to go out and
18 engage if there was activity out there.
19    Q.    Okay. Do you recall around what time that
20 you noticed Mr. Rosado on September 1st, 2015, during
21 your surveillance?
22    A.    I don't recall the exact time.            1:39:26
23    Q.    Okay. And what were your observations on
24 September 1st, 2015?
25    MS. ROMELFANGER: Objection to form. You can

1 answer.

2     A. At which point?

3     Q. While conducting your surveillance on

4 Diversey and Monticello.

5     A. I observed two individuals walk toward a van

6 on the southeast corner of Monticello, Diversey. That

7 was my initial surveillance.

8     Q. Okay. And is it fair to say once you saw

9 these individuals walking towards the van, you narrowed

10 the scope of your surveillance?

11     A. I don't know if I'd define it as narrowing

12 the focus of my surveillance.

13     Q. Okay. After you saw these individuals walk

14 towards the van on the southeast corner of Monticello

15 and Diversey, what did you observe after that?

16     A. I observed a third unknown male approach Mr.

17 Rosado on the driver's side of the van, toward the rear

18 of the van, and engage in a hand to hand transaction.

19 I then observed Mr. Rosado walk to the driver's side

20 door, attempt to conceal an item, appeared to be a golf

21 ball sized object in his pocket, and then enter the

22 van.

23     Q. Did you know Mr. Rosado when you made these

24 observations?

25     A. No. When I made the observations? No. All

1 three were unknown.

2     Q. And why do you believe it was Mr. Rosado that

3 made the hand to hand transaction?

4     A. Well I observed a person engage in this hand

5 to hand transaction and get in the front driver's seat,

6 and the person that was later apprehended in the front

7 driver's seat, I learned to be Mr. Rosado.

8     Q. Who informed you that the person that was

9 apprehended in the driver's seat was Mr. Rosado?

10     A. I don't recall which of my teammates actually

11 told me his name.

12     Q. Okay. So is it fair to say that if Mr.

13 Soliveras was actually in the driver's seat, you would

14 believe that he was the one that conducted the hand to

15 hand transaction?

16     MS. ROMELFANGER: Objection to form. You can

17 answer.                  1:43:30

18     A. Can you restate the question?

19     Q. Is it fair to say that if Mr. Soliveras was

20 actually in the driver's seat, you would believe that

21 he conducted the hand to hand transaction?

22     MS. ROMELFANGER: Same objection. You can

23 answer.

24     A. Well no, because Mr. Rosado matched the

25 description of clothing matched the person I saw enter

1 the van that we apprehended later.

2     Q. Well what was the description of -- of Mr.

3 Rosado on September 1st, 2015, when you observed him

4 doing the hand to hand transaction?

5     A. That, I don't recall. I'd have to review the

6 reports.

7     Q. Okay.

8     A. If it's in there.

9     Q. We'll mark this as Exhibit 2.

10     MS. ROMELFANGER: Thanks.

11     Q. Oh, here you go. Do you recognize this

12 document?

13     A. Yes.                     1:44:44

14     Q. And just for the record, I would just -- this

15 as the arrest report, which is Bates stamped FCRL

16 000022 to 000026. You can take a moment to look at

17 this document, look up when you're finished. Okay.

18 Does that refresh your memory in regards to what -- Mr.

19 Rosado's description?

20     A. Unfortunately, it doesn't list it here, so I

21 --

22     Q. Okay.

23     A. -- I don't recall.

24     Q. So outside of the reports, you don't recall

25 what Mr. Rosado was actually wearing?

1     A. I don't.

2     Q. On September 1st, 2015, just to clarify?

3     A. On that day, yes. No. I don't.

4     Q. Do you recall what Mr. Soliveras was wearing

5 on September 1st, 2015?

6     A. I don't.                 1:45:47

7     Q. Do you recall any descriptions related to Mr.

8 Rosado or Soliveras on September 1st, 2015?

9     MS. ROMELFANGER: Objection to form. You can

10 answer.

11     A. No. Do I -- do I recall giving descriptions?

12 Are you -- can you clarify? Are you asking if I

13 remember his -- his description?

14     Q. Do you remember either Rosado -- Mr. Rosado

15 or Mr. Soliveras' description?

16     A. Why I -- I remember some of their

17 description. I remember he's a male Hispanic, short

18 hair.

19     Q. Anything else you remember?

20     A. He was light complected. Approximately six

21 foot tall, hundred -- approximately 180 pounds.

22     Q. Anything else you can recall about Mr. Rosado

23 or Mr. Soliveras on September 1st, 2015?

24     A. No.                   1:47:22

25     Q. Okay. And did you personally radio in any --

Page 65

1  in any information related to Mr. Rosado on September
2  1st, 2015?
3      MS. ROMELFANGER: Objection to form. You can
4  answer.
5      A. When you say, "Radio," can you clarify?
6      Q. Well what form of communication did you use
7  to communicate with your team members on September 1st,
8  2015?
9      A. We used push to talk devices.
10     Q. Can you describe what push to talk devices
11 are?
12     A. It's similar to a cell phone, and it -- you
13 press a button, and you can communicate like a
14 walkie-talkie.
15     Q. Okay. So did you use push to talk to convey
16 information related to Mr. Rosado on September 1st,
17 2015?
18     A. Yes.                          1:48:35
19     Q. And what information did you convey over the
20 push to talk device to your team on September 1st,
21 2015?
22     A. I conveyed my observations, what I had
23 observed on Monticello, and that I believed an apparent
24 narcotics transaction had occurred, and I was
25 initiating mobile surveillance.

Page 66

1      Q. That push to talk, is it connected to only
2  your team members, or is it connected to other team
3  members in the gang investigation unit?
4      MS. ROMELFANGER: Objection to foundation.
5  You can answer.
6      A. Other -- I believe anyone with a device in
7  our unit could access the channel if it's -- if it's on
8  their device.
9      Q. Do you recall what channel you relayed this
10 information over?
11     A. I don't recall the number, the name of the
12 number, but typically each team has a -- you know, a
13 number that they use.
14     Q. Do you recall if you received any response to
15 the information that you relayed over the push to talk
16 device on September 1st, 2015?
17     A. Yes.                          1:50:11
18     Q. Do you recall who responded?
19     A. Don't recall the exact the response, but I'm
20 sure Officer Baldassano and Officer Apacible responded
21 or acknowledged my -- my transmission.
22     Q. Okay. Any other -- any other information
23 that you can recall in regards to the use of the push
24 to talk, specific conversation between you and or your
25 team members?

Page 67

1      MS. ROMELFANGER: Objection to form. You can
2  answer.
3      A. Not that -- I don't recall the specific words
4  I used, but I communicated, again, that I was
5  conducting mobile surveillance and was giving out
6  locations while conducting surveillance.
7      Q. Did you run a search on Mr. Rosado or Mr.
8  Soliveras?
9      A. I don't recall. After the arrest? Are you
10 -- are you asking me after --
11     Q. Yes.
12     A. -- he was arrested?
13     Q. Yes.                          1:51:44
14     A. Yeah. I don't -- I don't recall.
15     Q. Did you run a search on Mr. Rosado or Mr.
16 Soliveras prior to their arrest?
17     A. I don't believe so.
18     Q. Do you know if anyone else ran a search on
19 Mr. Rosado or Mr. Soliveras prior to their arrest?
20     A. I'm not aware of anyone doing that.
21     Q. How about after?
22     A. I'm sure some -- someone did. I just -- I
23 don't know who exactly performed that.
24     Q. Okay.
25     A. I might have. I don't -- I don't -- I don't

Page 68

1  recall.
2      Q. Do you recall if you had any recording
3  devices on your person or in your vehicle on September
4  1st, 2015?
5      MS. ROMELFANGER: Objection to form. You can
6  answer.
7      A. I didn't have any recording devices, other
8  than a cell phone, if you -- if you would classify that
9  as a recording device, my own, and the push to talk,
10 which I guess has recording capabilities.
11     Q. Did you record the -- your observations on
12 any of the -- in your cell phone or the push to talk?
13     A. No.                          1:53:24
14     Q. When conducting narcotic and or gang
15 surveillance, do you record any of your observations?
16     MS. ROMELFANGER: Objection to form. Vague.
17 You can answer.
18     A. There are times where we use video recording
19 or audio recording. Audio recording, again, typically
20 is done with judge authorization for undercover
21 purposes.
22     Q. Okay. And the video recording, is there a
23 typical situation where that's used for?
24     MS. ROMELFANGER: Objection to form. You can
25 answer.

Page 69

1   A.  I mean, there are times we -- we use it. It
2   -- it all depends on -- again, it goes back to the
3   goals of the investigation or if the equipment's
4   available, is working, functioning.
5       Q.  Have you ever recorded with the push to talk?
6       A.  Can you clarify, video recording or --
7       Q.  Yes.                          1:54:47
8       A.  I don't recall ever doing that.
9       Q.  You ever audio recorded with the push to
10  talk?
11      A.  No.
12      Q.  How about have you ever recorded with your
13  personal cell phone?
14      A.  Have I ever used video recording?
15      Q.  Have you ever used your cell phone to video
16  record?
17          MS. ROMELFANGER:  Objection to form. You can
18  answer.
19      A.  Video record police incidents?
20      Q.  Narcotic activity or -- I mean narcotics
21  surveillance or gang surveillance.
22      A.  No.
23      Q.  How about to audio record?
24      A.  No.
25      Q.  And you were testifying before you've used a

Page 70

1   video camera to video record narcotics surveillance or
2   gang surveillance?
3       A.  I have.                        1:55:53
4       Q.  How did you obtain the video camera?
5       A.  There are video cameras available within our
6   unit.
7       Q.  Okay.  You ever used a video camera to audio
8   record?
9       A.  Yes.
10      Q.  And what happens to that video footage once
11  you have -- what happens to that video footage after
12  you hit record?
13          MS. ROMELFANGER:  Objection to form and
14  foundation.  You can answer.
15      A.  Typically, it would get transferred to a disc
16  and then tendered, some point during the investigation,
17  to the state's attorney as evidence.
18      Q.  Okay.  Do you know if any other police
19  officer on your team had any recording devices on their
20  person or in their vehicle?
21      A.  Not that I'm aware of.          1:57:10
22      Q.  Okay.  Did you see the drugs on September
23  1st, 2015?
24      A.  After Mr. Rosado was taken into custody and
25  brought back to Homan Square, yes.

Page 71

1       Q.  Can you describe them?
2       A.  To the best of my recollection, it was a --
3   there was a plastic bag -- sandwich bag containing
4   another sandwich bag, which contained a golf ball sized
5   white chunk of cocaine and then a second plastic baggie
6   containing cannabis.
7       Q.  Where was the -- so you said a sandwich bag
8   within another sandwich bag, was the cannabis also
9   within that sandwich bag?
10      A.  To the -- to the best of my recollection,
11  yes.                                   1:58:37
12      Q.  Okay.  And as far as the -- so it's fair to
13  say you didn't see the police officer who actually
14  procured the drugs on September 1st, 2015, is that
15  correct?
16          MS. ROMELFANGER:  Objection to form and the
17  extent it misstates prior testimony.  You can answer.
18      A.  Can you clarify?
19      Q.  Did you -- were you on the scene of Mr.
20  Rosado's arrest on September 1st, 2015?
21      A.  I was in the area, but I was not on scene,
22  per se.
23      Q.  So it's fair to say you did not witness Mr.
24  Rosado's arrest on September 1st, 2015?
25      A.  That's correct.  I did not.       1:59:50

Page 72

1       Q.  And it's fair to say you did not see the
2   police officer who obtained the drugs from -- on
3   September 1st, 2015?
4           MS. ROMELFANGER:  I'm going to object to form
5   and extent that misstates prior testimony.  You can
6   answer.
7       A.  I -- I didn't observe the actual search and
8   stop of Mr. Rosado, no.
9       Q.  Are you aware whether or not any drugs was
10  obtained from Mr. Soliveras?
11      A.  I don't recall any -- anything being
12  uncovered, Mr. Soliveras.
13      Q.  Did you hear any conversation between any
14  member of your team and Mr. Rosado on September 1st,
15  2015?
16      A.  I'm sorry, did I hear any?
17      Q.  Yes.                           2:01:03
18      A.  I don't recall any.
19      Q.  Did you hear any conversation between any of
20  the members of your team and Mr. Soliveras on September
21  1st, 2015?
22      A.  I don't recall any.
23      Q.  Did you have any conversations with Mr.
24  Rosado on September 1st, 2015?
25      A.  Yes.

Page 73

1    Q.   What were the -- those conversations?
2    A.   Officer Apacible and I were processing --
3    obtaining information from him to complete our reports,
4    and essentially, he related that he was on parole,
5    related his gang affiliation.  He related that he was
6    working at a -- I think he said a Vietnamese restaurant
7    and supplementing his income by selling drugs.
8    Q.   Did you ask Mr. Rosado to become a
9    confidential informant on September 1st, 2015?
10   A.   No.
11   Q.   Did you hear any other officer on your team
12   ask Mr. Rosado to become a confidential informant on
13   September 1st, 2015?
14   A.   No.                              2:02:53
15   MS. BENSON:  Can we take a break?
16   MS. HAYWOOD:  Yeah.
17   RECORDER:  Off the record, 12:22 p.m.
18        (Off the record)
19   RECORDER:  Back on the record, 12:40 p.m.
20   Q.   Mr. -- Officer Mora, did you ask Mr.
21   Soliveras to be a confidential informant?
22   A.   No.
23   Q.   Did you hear any other officer ask Mr.
24   Soliveras to be a confidential informant?
25   A.   I did not.

Page 74

1    Q.   Okay.  Were you aware that the September 1st,
2    2015 search and arrest was recorded?
3    A.   I became aware of it.
4    Q.   When did you become aware?
5    A.   Our attorney advised us of that.       2:04:17
6    Q.   Okay.  Were you aware of any recordings --
7    devices on Monticello and or Diversey Boulevard on
8    September 1st, 2015?
9    A.   I'm not aware of any.
10   Q.   Okay.  Okay.  Do you recall what the --
11   during your observations on September 1st, 2015 when
12   you observed the hand to hand transaction, do you
13   recall what the other individual was wearing?
14   A.   I don't recall.
15   Q.   How far away would you say you were?
16   A.   To the best of my recollection, approximately
17   four to five car lengths.
18   Q.   Was any action taken in regards to the other
19   unknown individual?
20   A.   No.
21   Q.   Did you run Mr. -- did you run the plates on
22   the vehicle that you observed, the white van, on
23   September 1st, 2015?
24   A.   I may have.  I don't recall.
25   Q.   So after you observe the -- what you believe

Page 75

1    to be Mr. Rosado, on September 1st, 2015, engage in a
2    hand to hand transaction with another unknown
3    individual, did you stop to observe where the other
4    individual went after the transaction -- hand to hand
5    transaction on September 1st, 2015?
6    MS. ROMELFANGER:  Objection to form.  You can
7    answer.                              2:06:21
8    A.   I didn't stop.  I attempted to observe where
9    he was going, but I was unable to keep him in sight.
10   Q.   Okay.  And was there any -- was there any
11   markers around that Diversey and Monticello area that
12   you could identify on September 1st, 2015?
13   MS. ROMELFANGER:  Objection to form.  You can
14   answer.
15   A.   Yeah, I'm not sure what you mean by "marker."
16   Q.   For example, like, anything recognizable when
17   you would be on the Diversey and Monticello area?
18   MS. ROMELFANGER:  Objection to form.  You can
19   answer.
20   A.   Do I recall anything today?
21   Q.   Yes.
22   A.   That was there in 2015?
23   Q.   September 1st, 2015, yeah.
24   A.   I don't recall any specifically.
25   Q.   Okay.  Do you recall what -- where -- like,

Page 76

1    how the white van was on -- do you recall what street
2    the white van was on while you were observing on
3    September 1st, 2015?
4    A.   Yes.
5    Q.   What street was --
6    A.   Monticello.
7    Q.   And how -- do you recall how the car was --
8    the white van was positioned?
9    A.   Yes.                              2:08:06
10   Q.   How was it positioned?
11   A.   It was facing northbound.
12   Q.   Okay.  And did it ever change direction while
13   you were observing it on September 1st, 2015?
14   A.   Yes.
15   Q.   What direction did it change?
16   A.   Through the mobile surveillance, it changed
17   directions several times.  I recall it going eastbound
18   on Diversey.  I recall it on the expressway going
19   southeast.
20   Q.   Okay.  Were you following closely behind the
21   vehicle while it was -- when it changed directions?
22   MS. ROMELFANGER:  Objection to form.  You can
23   answer.
24   A.   I was following the vehicle, and there were
25   points during the surveillance I observed it turn, for

1  example, turned off of Monticello onto Diversey.

2     Q.  Did you ever lose sight of the vehicle while

3  you were pursuing?

4     A.  At some point, I personally did, but our team

5  was able to maintain surveillance the whole time.

6     Q.  Do you recall who on your team was able to

7  maintain the surveillance?

8     A.  Officer Apacible and Baldassano were the

9  other surveillance officers that day.

10     Q.  At what point would you say you lost sight of

11  the white van while in pursuit?

12     A.  I don't recall that.          2:10:17

13     Q.  Do you recall who made the call for Mr.

14  Rosado and Mr. Soliveras to be arrested on September

15  1st, 2015?

16       MS. ROMELFANGER: Objection to form. You can

17  answer.

18     A.  I'm not sure I understand your question.  I

19  don't -- I don't recall it being a -- are you asking

20  who made the decision --

21     Q.  Yes.

22     A.  -- to arrest him?  Well that would have been

23  the enforcement officers.

24     Q.  And what was your purpose for pursuing the

25  white van on September 1st, 2015?

1     A.  Well I didn't pursue it.  I -- I was

2  conducting surveillance, and based on my observations

3  prior to the two gentlemen entering the van is why I

4  decided to conduct continued surveillance.

5     Q.  Okay.  So after they entered the white van,

6  the two individuals, and they went -- I believe you

7  said, changed on -- eastbound onto Diversey, is that

8  correct?

9     A.  Correct.  Initially, the van traveled --

10  turned eastbound on Diversey from Monticello.

11     Q.  You mentioned you did not pursue it, so is it

12  fair to say you stayed and continued to observe it, and

13  then is it -- is it at that point that you used the

14  push to talk to communicate that to the rest of your

15  team?

16     A.  Well I communicated observations prior to the

17  van leaving.  And then once the -- the van began to

18  move, I don't recall the exact words I used, but I'm

19  sure I communicated that I was following the van.

20     Q.  How did you follow the van?

21       MS. ROMELFANGER: Objection to form. You can

22  answer.

23     A.  I was using a covert vehicle.    2:13:12

24     Q.  Okay.  How -- how long did you follow the

25  van?

1     A.  I don't recall the exact time, but

2  approximately 30 to 45 minutes, in that range.

3     Q.  Do you recall if it was -- the time of day

4  which you began your observations?

5     A.  I don't recall the exact time.  It was

6  nighttime, I recall that.

7     Q.  Do you recall the weather conditions on

8  September 1st, 2015?

9     A.  I recall it was a clear night.  No rain,

10  snow.

11     Q.  Okay.  And do you recall how long you were

12  following the van before you lost sight of it?

13     A.  I don't recall that.        2:14:35

14     Q.  Okay.  Were you the only one pursuing --

15  strike that.  Did you see anyone else from your team

16  pursue the white van, did you personally see that on

17  September 1st, 2015?

18       MS. ROMELFANGER: Objection to form. You can

19  answer.

20     A.  I didn't see anybody pursue the vehicle.

21     Q.  Okay.  What is your belief for the basis of

22  the probable cause to arrest both Mr. Soliveras and Mr.

23  Rosado on September 1st, 2015?

24       MS. ROMELFANGER: Objection to form and the

25  extent it calls for a legal conclusion.  You can

1  answer.

2     A.  The probable cause that was related to me,

3  which was that Mr. Rosado stated he had narcotics, and

4  the narcotics were recovered.

5     Q.  Okay.  Who made the call to release Mr.

6  Soliveras?

7       MS. ROMELFANGER: Objection to foundation.

8  You can answer.

9     A.  I don't recall anyone specifically.    2:16:16

10     Q.  Okay.  And when did Mr. Rosado make this

11  statement to you?

12       MS. ROMELFANGER: Objection to form. Can you

13  clarify which statement you're talking about, Tia?

14       MS. HAYWOOD:  Sure.

15     Q.  You testified earlier that Mr. Rosado made a

16  statement to you that he had narcotics, so can you tell

17  me what -- what point he made this statement?

18       MS. ROMELFANGER: Objection to the extent

19  that misstates prior testimony.  You can answer.

20     A.  I think I -- I stated that, while at Homan

21  Square, he indicated he was supplementing his income by

22  selling narcotics.

23     Q.  Okay.  Do you know why Mr. Soliveras was

24  arrested?

25       MS. ROMELFANGER: Objection to form.  You can

Page 81

1 answer.
2    A.  To my knowledge, he wasn't arrested.    2:17:19
3    Q.  What do you consider when someone is
4 arrested?
5    MS. ROMELFANGER:  Objection to form.  You can
6 answer.
7    A.  I consider them to be charged and held for a
8 crime.
9    Q.  Okay.  Do you recall where Mr. Soliveras was
10 taken?
11    A.  Yes.
12    Q.  Where?
13    A.  Homan Square.
14    Q.  Did you see -- at what point did you see Mr.
15 Soliveras at Homan Square?
16    A.  I don't recall seeing him.
17    Q.  Do you know whether or not Mr. Soliveras was
18 interrogated?
19    A.  Not to my knowledge.
20    Q.  Did you interrogate Mr. Rosado on September
21 1st, 2015?
22    A.  I had an opportunity to speak with him.    2:17:19
23    Q.  Okay.  Were there any pictures taken at the
24 scene of September 1st -- 1st, 2015 arrest that you
25 know about?

Page 82

1    A.  Not that I'm aware of.
2    Q.  Do you know who held onto the drugs after the
3 September 1st, 2015 arrest?
4    A.  After the arrest, it would be the recovering
5 officer.
6    Q.  Do you know who the recovering officer was?
7    A.  I believe it was Officer Heyden.
8    Q.  So is it fair to say that you never arrived
9 at 47th and South Wallace, you only saw Mr. Rosado and
10 Mr. Soliveras at -- at Homan Square on September 1st,
11 2015?
12    A.  Well, no, I saw them during the surveillance.
13    Q.  Okay.  So aside from --
14    A.  But not at -- not at that location of arrest,
15 correct.
16    Q.  And just to clarify, you didn't arrive on the
17 scene on -- at 47th and Wallace on September 1st, 2015?
18    A.  I did not.    2:20:06
19    Q.  Okay.  Did you have any further interaction
20 with Mr. Rosado or Mr. Soliveras after September 1st,
21 2015?
22    A.  In court, I observed him.
23    Q.  Okay.  When you say, "In court," did you
24 enter -- you say you observed.  Can you clarify who you
25 observed?  Was it Mr. Rosado, Mr. Soliveras, or both?

Page 83

1    A.  Mr. Rosado.
2    Q.  Did you see Mr. Soliveras in court after
3 September 1st, 2015?
4    A.  I don't believe so.
5    Q.  Was the time -- at Homan Square when Mr.
6 Rosado indicated that he used the narcotics to
7 supplement his income and was on parole, was that the
8 first time you became aware that Mr. Rosado was on
9 parole?
10    A.  Correct.
11    Q.  Okay.  And did you personally call Mr.
12 Rosado's parole officer?
13    A.  I may have.  I don't recall.    2:21:40
14    Q.  Are you aware of any Chicago Police
15 Department policy regarding contacting --
16    A.  You mean -- I'm sorry.  You mean after the
17 arrest, correct?
18    Q.  Yes.
19    A.  Yes.  After the arrest, I may have.  Before,
20 I never talked to his parole officer, but after the
21 arrest, I may have.  I believe somebody did from our
22 team, but I don't recall who.
23    Q.  Okay.  Are you aware of any Chicago Police
24 Department policy regarding contacting arrestee's
25 parole officer?

Page 84

1    MS. ROMELFANGER:  Objection to foundation, to
2 the extent he's not here as a 30(b)(6).  You can
3 answer.
4    A.  I don't -- I couldn't state the general order
5 to you, but I -- it's my understanding that when an
6 arrestee is taken into custody and -- and is going to
7 be charged, and they are found to be on parole, that we
8 notify IDOC, and at that point, my understanding is
9 it's their decision as to what they are going to do in
10 terms of violating the parole and so forth.
11    Q.  Do you provide any additional information to
12 the parole officer or the Illinois IDOC in regards to
13 an arrestee?
14    MS. ROMELFANGER:  Objection to form.  You can
15 answer.
16    A.  Typically?    2:23:11
17    Q.  Yes.
18    A.  Typically, we would notify them of the
19 individual in custody and what they were going to be
20 charged with.
21    Q.  Do you have any further communication after
22 communicating that information to IDOC or the
23 individual's paroles -- parole officer?
24    MS. ROMELFANGER:  Objection to form.  You can
25 answer.

Page 85

1    A.  It would depend, but -- are you saying in
2  this case?  In terms of --
3    Q.  Do you recall --
4    A.  -- Mr. Rosado?
5    Q.  I'm sorry.  Do you recall what happened in
6  regards to Mr. Rosado's parole?
7    A.  I -- I don't -- well, if you're asking me
8  that question regarding Mr. Rosado, I would say I don't
9  recall having any conversation with anyone from IDOC
10  after the arrest, if that -- if that was the question.
11    Q.  How about in general --
12    A.  Other than possibly the -- the notification.
13    Q.  Okay.  How about in general?
14      MS. ROMELFANGER:  Objection to form.  You can
15  answer.
16    A.  It would be a case by case basis.
17    Q.  Okay.  And generally, how soon after the
18  arrest is the arrestee's parole officer contacted or
19  the IDOC?
20      MS. ROMELFANGER:  Objection to form.  You can
21  answer.
22    A.  Generally, it's pretty quickly after the
23  arrest, while processing the paperwork, before they
24  would be fingerprinted.
25    Q.  And in Mr. Rosado's case, do you recall how

Page 86

1  soon after his arrest that his parole officer was
2  contacted?
3    A.  I mean, I don't -- I don't recall who did it,
4  but you know, if they were notified, I'm pretty sure it
5  would have been before he was fingerprinted.  Someone
6  most likely called at Homan Square while we were doing
7  the paperwork.
8    Q.  Okay.  Is the processing at Homan Square
9  different than at other districts that you've worked at
10  before?
11    A.  Yes.                           2:25:39
12    Q.  What's the difference?
13    A.  There's no holding facility.
14    Q.  There's no holding facility where?  Can you
15  clarify?
16    A.  So typically, a holding facility would be a
17  -- have a fingerprint machine and be the location where
18  the inmate -- or the arrestees are held until they are
19  either bonded out or go to court the next day.
20    Q.  Okay.  And which of the previous places that
21  you've worked does not have a holding facility, or are
22  you referring to -- Homan Square does not have a
23  holding facility?
24    A.  Right.  Homan -- Homan Square does not have a
25  holding facility --

Page 87

1    Q.  Okay.
2    A.  -- in -- in that respect.  There are rooms
3  where arrestees can be secured, but there's no
4  fingerprint machine, and they're not held there for
5  transport to court, things like that.
6    Q.  Okay.  And was -- do you know why Mr. Rosado
7  and Mr. Soliveras was taken to Homan Square?
8      MS. ROMELFANGER:  Objection to the
9  foundation.  You can answer.
10    A.  Well, Mr. Rosado, I believe, was taken there
11  because he was -- there was probable cause to -- to
12  arrest him, and he was going to be processed.  In terms
13  of Mr. Soliveras, my best understanding is the
14  enforcement officers were investigating his involvement
15  in the incident.
16    Q.  Did anyone -- was anyone else with you when
17  you spoke with Mr. Rosado at Homan Square on September
18  1st, 2015?
19    A.  Yes.                           2:27:52
20    Q.  Who?
21    A.  Officer Apacible.
22    Q.  Did you ask Mr. Rosado any questions?
23    A.  Yes.
24    Q.  What questions did you ask?
25    A.  Well, we were completing paperwork, so I

Page 88

1  recall asking him his, you know, demographics, his
2  name, birth date, if he was on parole, general
3  questions like that.
4    Q.  Any other questions that you can recall
5  specifically that you asked Mr. Rosado on September
6  1st, 2015?
7    A.  I don't recall.  I may have asked him if he
8  -- I may have followed up with some questions on some
9  of his statements regarding being a gang member in the
10  area that I used to work at, but I don't -- I don't
11  recall the exact questions, but we had a conversation.
12    Q.  Okay.  Do you recall asking Mr. Rosado any
13  information on other gang members, or guns, or drugs?
14    A.  I don't recall specifically any questions.  I
15  may have asked him if he knew certain individuals that
16  -- that I was aware of in his gang from the area --
17  from the 14th district and 25th district, but I don't
18  remember the specific questions.
19    Q.  Okay.  Do you recall how long you spoke with
20  Mr. Rosado -- Mr. Rosado on September 1st, 2015?
21    A.  Approximately ten to 15 minutes.    2:29:46
22    Q.  Okay.  And you did not speak with Mr.
23  Soliveras at Homan Square, is that correct?
24    A.  I don't recall speaking with him.
25    Q.  Okay.  And you don't -- is it fair to say you

1  don't recall if anyone else spoke with Mr. Soliveras at
2  Homan Square?
3      A.  I don't.
4      Q.  Okay.
5          MS. ROMELFANGER:  Objection to foundation.
6      Q.  Okay.  Did you personally write any reports
7  in regards to the statements in relation to Mr. Rosado
8  and or this case?
9      A.  Can you -- can you repeat the question?
10 Sorry.
11     Q.  Did you personally write any reports -- write
12 down any statements or any other type of documents in
13 relation to Mr. Rosado and or this case?
14     A.  Yes.
15     Q.  Do you recall what those reports were?
16     A.  Yes.  I believe I completed the supplemental
17 report and the arrest report.
18     Q.  And the arrest report would be that report in
19 front of you labeled as Exhibit 2, is that --
20     A.  Correct.
21     Q.  Okay.  We can label this as Exhibit 3.
22         MS. ROMELFANGER:  Thanks.
23     Q.  Okay.  Take a moment to look through the
24 document.  Look up when you're done.  And for the
25 record, this is labeled as Exhibit 3.  It's Bates

1  stamped FCRL 000057 to 000060.  Okay.  Do you recognize
2  this document?
3      A.  Yes.
4      Q.  What is it?
5      A.  This is the gang investigation supplemental
6  report.
7      Q.  And is it a true and accurate copy of what it
8  purports to be?
9      A.  It -- it appears to be.  Yes.        2:32:15
10     Q.  Okay.  And if you could turn to -- oh, sorry.
11 If you could look at FCRL 00057, the first page?
12     A.  Mm-hmm.
13     Q.  So this information listed in the report
14 regarding, like, the offender information, that would
15 be information that you received from Mr. Rosado?
16     A.  Yes, some of it, most likely.  Some of it may
17 have been obtained by running him through the computer.
18     Q.  So is it possible that Mr. Rosado's gang
19 affiliation was already notated in your -- in the
20 system when you ran his name?
21         MS. ROMELFANGER:  Objection.  Foundation.
22 You can answer.
23     A.  It's possible.                      2:33:32
24     Q.  And if you turn to the second page, it was --
25 and if you look at the section that says, "Gang

1  affiliation," you see that that gang affiliation is
2  Orchestra Albany listed?
3      A.  Mm-hmm.
4      Q.  And where -- you said that you were familiar
5  with the -- Mr. Rosado's gang affiliation.  Do you know
6  the boundaries of the Orchestra Albany gang?
7      A.  Generally.
8      Q.  What is your belief, based on your experience
9  of what those boundaries are?
10     A.  To the best of my knowledge, in the 14th
11 district, which is where I'm most familiar with them,
12 they -- they have two sets.  One is Darwin City, which
13 is the area surrounding the Darwin Elementary School,
14 just east of Sacramento, and the other would be in the
15 area of -- I forget the name of the set, if it's
16 Milwaukee -- but it's in the area of, like, Diversey
17 and Milwaukee, in that -- in that pocket.
18     Q.  Because I'm not familiar with it, I just
19 wanted to clarify, do you recall -- do you know what
20 district 47th and South Wallace is in?
21     A.  Off the top of my head, I don't.
22     Q.  Oh, okay.  I don't either.  Is it in the 14th
23 district?
24     A.  47th and Wallace?
25     Q.  Yes.

1      A.  No.                                2:35:29
2      Q.  Okay.  And if you turn to the third page, it
3  says, "Inventoried narcotics."  Did you complete any of
4  these inventory reports listed on this?
5      A.  I -- that, I don't recall.
6      Q.  Okay.  And did you complete the -- if you
7  look on FCRL 00059 to 00060, did you complete this
8  narrative?
9      A.  Yes.
10     Q.  And would you say your -- this narrative is
11 an accurate statement of what occurred on September --
12 what you observed on September 1st, 2015?
13     A.  I would say it's accurate.  I didn't observe
14 all of it.  Some of it was, like I said, enforcement
15 officers relating to me information summarizing the
16 arrest, but it's accurate.
17     Q.  Okay.  And do you recall who specifically
18 relayed you information that -- that assisted you in
19 completing this report?
20     A.  I recall talking to everybody on my team, but
21 I don't recall the specifics of who related what to me.
22     Q.  Okay.  And then, in there, see do -- recall
23 about the reports -- okay.  I'd like to label this one
24 as Exhibit --
25         MS. HAYWOOD:  What are we on?

Page 93

1    RECORDER: 4.
2    Q. -- 4. Here you go. Okay. Then this will be
3    Exhibit 5. Be Exhibit 5. Do you recognize this
4    document, which is Exhibit 4 for the record, labeled as
5    FCRL 00073 to 00075?
6    A. And I recognize 75, would be the one that --
7    that we complete. The other two, I don't. Somebody
8    else completes those. I'm not sure who.
9    Q. Okay. So you recognize 75. If you can turn
10   to 75. So this is a document that you just testified
11   that you complete -- you recognize. Did you complete
12   this document?
13   A. Yes.                              2:40:10
14   Q. And what is this document?
15   A. It's -- it's the vehicle impoundment form.
16   Q. Did you impound Mr. -- the vehicle, that
17   white van that Mr. Rosado was in?
18   A. Yes, we -- I completed this form to impound
19   the vehicle.
20   Q. How was the vehicle impounded?
21      MS. ROMELFANGER: Objection to form. You can
22   answer.
23   A. I'm not aware. We -- we drop this off with
24   the keys, and it's out of our hands at that point.
25   Q. Do you recall where you dropped it off at?

Page 94

1    A. Typically, to the guard shack at Homan
2    Square.
3    Q. Do you know how Mr. Rosado's vehicle got to
4    Homan Square?
5    A. I don't recall.
6    Q. Okay. Did you see his vehicle when it
7    arrived at Homan Square?
8    A. No.
9    Q. Did you see it any time after the September
10   1st, 2015 date, the white van?
11   A. After 2015 --
12   Q. Yes.
13   A. -- on the arrest date?
14   Q. Yes.
15   A. Not that I recall.
16   Q. Okay. And if you can take a look at the
17   document labeled as Exhibit 5, which, for the record --
18   A. Sure.
19   Q. -- is FCRL 000123 to 000124. Do you
20   recognize this document?
21   A. Yes.
22   Q. What is it?
23   A. This is a general offense incident report.
24   Q. And did you personally complete this report?
25   A. I don't recall. I don't recall. From the

Page 95

1    looks of the report, it appears Officer Baldassano did
2    it, but I -- I don't remember.
3    Q. Okay. And then are you familiar with the
4    felony review process of the Cook County State's
5    Attorney's Office?
6    A. Yes. Can I go back to --
7    Q. Yes, of course.
8    A. -- I just realized that this is actually a
9    vice case report, not a general offense, sorry.
10   Q. Okay. You said it was -- can you repeat that
11   again?
12   A. This is -- it's a -- it's vice.
13   Q. Vice.
14   A. It's called a vice report --
15   Q. Okay.
16   A. -- because it's related to narcotics.
17   Q. Okay. Thank you.
18   A. Sure.                            2:43:39
19   Q. And then the question was, are you familiar
20   with the felony review process of the Cook County
21   State's Attorney's office?
22   A. Yes.
23   Q. What is, typically, your role in that
24   process?
25      MS. ROMELFANGER: Objection to form. You can

Page 96

1    answer.
2    Q. It would depend on the situation. The
3    process -- do you mean the process of getting felony
4    charges approved?
5    A. Yes. My -- I mean, typically, generally,
6    would involve contacting the state's attorney and
7    communicating a summary of the incident that you're
8    looking to get felony charges approved on.
9    Q. Did you play a role in Mr. Rosado's felony
10   review process regarding the September 1st, 2015
11   arrest?
12      MS. ROMELFANGER: Objection to the extent
13   that states -- sorry, misstates facts not in evidence.
14   You can answer.
15   A. It's my understanding that there's no
16   requirement to contact felony review for narcotics --
17   felony narcotics charges.
18   Q. Do you know how charges were initiated
19   against Mr. Rosado in relation to the September 1st,
20   2015 arrest?
21   A. I'm not clear on your question. What do you
22   mean by "initiated"?
23   Q. How did the criminal proceedings begin
24   against Mr. Rosado, if you're not required to contact
25   the state for felony review process?

1      MS. ROMELFANGER: Objection. Form and
2  foundation. You can answer.
3      A. Well, officers found -- to the best of my
4  understanding, officers found probable cause to place
5  him in custody and charge him with narcotics, at which
6  point, the state's attorney was given our documentation
7  and decided to indict him on -- through the grand jury.
8      Q. Do you -- did you have any conversations with
9  the state's attorney where you relayed those
10 observations on September 1st, 2015?
11      MS. ROMELFANGER: Objection to form. You can
12 answer.
13      A. I'm sure I had conversations with the
14 attorney handling the case and whoever I went through
15 the grand jury with.
16      Q. Okay.
17      A. Actually, strike that. No, I -- I believe --
18 I can't remember if it was grand jury or Branch 50.
19      Q. Okay. And did you -- do you recall whether
20 or not you went through a felony review process with
21 the state's attorney regarding September 1st, 2015
22 arrest of Mr. Rosado?
23      A. Can you repeat that?              2:46:56
24      Q. Do you recall whether or not you went through
25 a felony review process with the state's attorney for

1  Mr. Rosado?
2      MS. ROMELFANGER: Objection to form and the
3  extent that's been asked and answered. You can answer.
4      A. There -- again, there was no -- there's no
5  requirement, to -- to the best of my understanding, to
6  contact felony review to get charges approved for
7  narcotics, so no, there was no felony review process
8  prior to charging him.
9      Q. Okay. And then when the -- is it fair to say
10 that the state's attorney relies upon information
11 that's provided by -- provided by the police officers
12 in -- in regards to Mr. Rosado to pursue the charges
13 against --
14      MS. ROMELFANGER: Objection to form and
15 foundation. You can answer.
16      A. Can you repeat the question one more time?
17      Q. Is it fair to say that the state's attorney
18 relies upon the information provided by your team --
19 you or your team in regards to pursuing felony charges
20 against Mr. Rosado?
21      MS. ROMELFANGER: Same objection.
22      A. I believe that's fair.
23      MS. HAYWOOD: Okay. Can we mark this as
24 Exhibit 6?
25      Q. Here you go.

1      A. Thanks.
2      Q. Do you recognize that document?
3      A. Yes.
4      Q. Okay. What is it?              2:49:12
5      A. That is the felony complaint.
6      Q. And for the record, I am referring to Exhibit
7  6, which is Bates stamped FCRL 001050 to 1 -- 001051.
8  Did you personally complete this, or did you personally
9  sign this complaint?
10      A. I believe I did.
11      Q. And is this the criminal complaint which you
12 testified earlier initiated charges against Mr. Rosado?
13      MS. ROMELFANGER: Objection to the extent
14 that misstates prior testimony. You can answer.
15      A. Again, I'm -- I'm not clear on your question.
16 Is --
17      Q. So -- oh, go ahead.
18      A. Yeah, can you clarify?
19      Q. Sure. So you testified earlier that because
20 it's a -- the type of case it is, you don't -- you're
21 not required -- or it's a narcotic case, you're not
22 required to contact the state for a felony review
23 process. So is this the charging document that you
24 believed initiated the charges with Mr. Rosado for
25 his felony case?

1      MS. ROMELFANGER: Objection to form and
2  foundation. You can answer.
3      A. Well, these are the -- the complaints that
4  are -- substantiate the charges that we list in the
5  arrest report.
6      Q. And based upon these complaints, is it fair
7  to say that criminal charges are then initiated against
8  Mr. Rosado?
9      MS. ROMELFANGER: Objection to form.
10 Foundation. You can answer.
11      A. That's my understanding.
12      Q. Okay. Okay. And in filling out these
13 complaints, you -- did you choose the -- the offenses?
14      A. I don't believe I personally chose them. I
15 believe, after discussing with team members the
16 incident, we -- we selected what we thought was
17 appropriate.
18      Q. Okay. So you -- you believe that you chose
19 the charges after basically meeting or in consultation
20 with your team members?
21      A. Correct.                  2:52:19
22      Q. Okay. And we're almost done. I'm going to
23 label this Exhibit 7. Here you go.
24      A. Thank you.
25      MS. HAYWOOD: Exhibit 7.

Page 101

1      MS. ROMELFANGER: Thanks.

2    Q. I'm handing you what has been marked as

3 Exhibit 7. For the record, it is Bates stamped FCRL

4 002 -- 002155. It is also Bates stamped CCSAO 002,

5 FCRL 002170, CCSAO 0017, FCRL 002187, CCSAO 034, FCRL

6 00213 -- 2193, sorry, CCSAO 040, FCRL 002195, CCSAO

7 042, FCRL 002196, CCSAO 043, FCRL 002197, CCSAO 044,

8 FCRL 002213, CCSAO 060. And that would be excerpts

9 from the document produced by the Defendants' Counsel,

10 Bates stamped FCRL 002154 to 002328, for the record.

11 Do you recognize the -- looking -- referring to FCRL

12 002155, the first page, do you recognize -- did you

13 personally write any of these statements?

14    A. No.              2:54:53

15    Q. Okay. If you could take a moment to read

16 them, and look up when you're done? Just the first

17 page.

18    A. Oh.

19    Q. Sorry.

20    A. Sorry.

21    Q. It's okay.

22    A. Okay.

23    Q. Is the statements look accurate as an excerpt

24 of information relayed to the state's attorney?

25      MS. ROMELFANGER: Objection to form. You can

Page 102

1 answer.

2    A. Appears to be accurate.      2:55:46

3    Q. Okay. And let's see. Are you aware of the

4 chain of custody of the drugs secured on September 1st,

5 2015?

6    A. Generally, yes.

7    Q. Can you describe the chain of custody of the

8 drugs procured from the -- as a result of the September

9 1st, 2015 arrest?

10    A. To the best of my knowledge, Officer Heyden

11 recovered the narcotics. At which time, it was brought

12 to Homan Square and later inventoried by Officer

13 Apacible, I believe, and then at that point, it would

14 have been deposited into a safe, collected by an

15 outside unit or sent to the forensic lab.

16    Q. Are there any reports that you and or any

17 members of your team have to complete in regards to the

18 chain of custody?

19    A. We're required to do an inventory report.

20    Q. Okay. At any point, were you in custody of

21 the drugs from the September 1st, 2015 arrest?

22    A. Well, would you consider, if it was in our

23 office, custody of it?

24    Q. Would you believe that that's you personally

25 having custody of the drugs from the September 1st,

Page 103

1 2015 arrest?

2    A. Again, I would ask how you define "custody"?

3    Q. Well, how would -- how would you define

4 "custody"?

5    A. Well, it -- it -- I would say that we had

6 secured it. I wouldn't -- I wouldn't define my role as

7 having custody of it.

8    Q. Okay. Okay. What's the Exhibit -- this will

9 be Exhibit 8 -- couple more. Okay. There you go.

10 Exhibit 8. For the record, I'm handing you what --

11 what has been marked as Exhibit 8, which is Bates

12 labeled FCRL 001291 to 001294. Do you recognize this

13 document?

14    A. I've never seen it before, but it looks like

15 a chain of custody document.

16    Q. Okay. And referring to page 1, in regards to

17 the chain of custody, how does this process start? How

18 is this documented, if you -- if you know?

19      MS. ROMELFANGER: Objection to form. You can

20 answer.

21    A. I'm not -- I'm not -- are you asking how --

22 how -- how I would define all these things? Because I

23 -- I wouldn't be aware of that.

24    Q. Okay.            3:00:29

25    A. I -- I could probably explain a few line

Page 104

1 items here, but --

2    Q. Okay. Can you explain the line items that

3 you do understand?

4    A. Well, like "inventory submitter." That would

5 be the person who submits the inventory.

6    Q. And you testified earlier that was Officer

7 Apacible?

8    A. Correct.

9    Q. And that is Officer Apacible would be the

10 last line. What would be -- do you know what a "hold

11 creator" is?

12    A. I don't. I mean, there's a -- my guess is

13 that on the report, I was listing -- listed in a field

14 that asks if you want to hold the evidence of not, and

15 to the best of my recollection, you have to enter

16 someone's star number, so mine was probably entered

17 there is my --

18    Q. All right.

19    A. -- is my guess.

20    Q. And what would be the purpose of holding the

21 evidence?

22    A. Well, anytime we arrest someone and there's

23 evidence, we have to preserve it for the state's

24 attorney.

25    Q. Okay. Okay. Is it a fair statement that the

Page 105

1  FCRL 001293 is basically the same, just for the
2  cannabis --
3      A.  I'm sorry, which number?
4      Q.  -- for this case?  Sorry, FCRL 001293.        3:02:09
5      A.  I mean, they appear to be similar reports.
6      Q.  Okay.  The second one, FCRL 001293, just
7  being for the cannabis instead of the first one being
8  for the cocaine --
9      A.  That's --
10     Q.  -- that --
11     A.  -- that -- that looks correct, yes.
12     Q.  Okay.  All right.  I'm going to refer you
13  back to Exhibit 7.  You testified earlier about a lab
14  report.  If you could turn to FCRL 002187, I believe it
15  is the third page of this excerpt.
16     A.  2187?
17     Q.  Okay.
18     A.  Okay.
19     Q.  Do you recognize this document?
20     A.  Yes.
21     Q.  What is it?
22     A.  It's a lab report from the state police
23  forensic services.
24     Q.  And do you know why it's -- well we -- do you
25  know why it's addressed to you?

Page 106

1          MS. ROMELFANGER:  Objection to foundation.
2  You can answer.
3      A.  I don't.  Again, my -- my guess would be my
4  name was on the reports somewhere that they got.
5  Specifically, I don't -- I don't know.
6      Q.  Okay.  Did you personally submit the drugs --
7  or narcotics, I'm sorry, to the lab -- the Illinois
8  State Police Lab?
9      A.  Personally?
10     Q.  Yes.
11     A.  No.
12     Q.  Okay.  If you could turn to the next page,
13  FCRL 002193.  And if you could read that to yourself,
14  and look up when you're done.
15     A.  Okay.
16     Q.  Okay.  Does this look like an -- an accurate
17  -- does this look like an accurate excerpt of
18  information that the state's attorney had -- that was
19  provided?
20         MS. ROMELFANGER:  Objection to foundation and
21  form.  You can answer.
22     A.  It appears to be a portion of -- of what --
23  what occurred.
24     Q.  Okay.  Okay.  Did you attend any of the court
25  proceedings against Mr. Rosado?

Page 107

1      A.  Yes.                                          3:05:50
2      Q.  Do you recall which proceedings those were?
3      A.  Yes, the -- I believe it was the -- a grand
4  jury probable cause hearing and -- and a motion.
5      Q.  Okay.  If you could turn to the next page on
6  Exhibit 7, 00 -- FCRL 002195.  Does that look like an
7  accurate excerpt of information that the state's
8  attorney received from you?
9          MS. ROMELFANGER:  Object -- objection to
10  form, foundation, and the fact that it assumes facts
11  not in evidence.  You can answer.
12     A.  Can you repeat the question?
13     Q.  Did this -- if you could read this to
14  yourself, FCRL 002195.  The question is does this look
15  like an accurate excerpt of information that the
16  state's attorney received from you?
17         MS. ROMELFANGER:  Same objection to form,
18  foundation, and assuming facts not in evidence.
19     A.  I don't recall if this was received by me or
20  if I related this to the state's attorney.
21     Q.  Well the -- based on the excerpts here, does
22  it look accurate?
23     A.  Generally, yes.
24     Q.  Okay.  Okay.  And then you mentioned that you
25  went to the grand jury probable cause hearing and the

Page 108

1  motion.  If you could turn to FCRL 2 -- 2196, which is
2  the next page.  Do you recognize this document?
3      A.  I've seen one before.  I mean, I don't -- I
4  don't know that I've seen this one, but yes, I
5  recognize it as s a court notification.
6      Q.  Do you recall if you went to court on May
7  12th, 2016?
8      A.  That, I don't recall.                         3:08:18
9      Q.  Okay.  Okay.  Can you turn to the next page,
10  FCRL 2197?  You recognize this to also be -- do you
11  recognize this to also be a court notification?
12     A.  Yes.
13     Q.  And do you recall if you attended court on
14  November 24th, 2015?
15     A.  I don't recall.
16     Q.  Okay.  If you can turn to the last page in
17  this document, which is FCRL 002213.  Do you recognize
18  this to also be a court notification?
19     A.  Yes.
20     Q.  Do you recall if you went to court on
21  September 24th, 2015?
22     A.  I believe so.  To the best of my
23  recollection, yes.
24     Q.  What was your purpose for that court date, if
25  you can recall?

Page 109

1    MS. ROMELFANGER: Objection to foundation.
2  You can answer.
3    A.  To the best of my recollection, it was the --
4  that would have been testifying for the grand jury
5  probable cause hearing.
6    Q.  Okay.  And then -- okay.  Okay.  Here you go.
7  Handing you what has been marked as Exhibit 9.  For the
8  record, it is Bates stamped Rosado 000485 to 000492.
9  If you could read through this document to yourself,
10  and look up when you're done.  Your testimony looks
11  accurate?
12    A.  Correct.                          3:12:01
13    Q.  Okay.  And that would be the September 24th,
14  2015 day where you received the court -- court
15  notification previously mentioned?
16    A.  Yes, this was the day I testified.
17    Q.  Okay.
18    A.  24 September 2015.
19    Q.  Okay.  And you mentioned before about a
20  motion.
21    MS. HAYWOOD: Can you mark this as Exhibit --
22  where were we?
23    RECORDER:  10.
24    MS. HAYWOOD: 10.
25    Q.  Here you go.

Page 110

1    A.  Thank you.
2    Q.  If you could take a moment to read through
3  this, and for the record, I am -- I handed you what has
4  been marked as Exhibit 10, which is Bates labeled
5  Rosado 00013, 00014, and then 00016 to 00037.  Do you
6  believe your testimony in the document identified as
7  Exhibit 10 is accurate?
8    A.  Yes.                              3:17:03
9    Q.  Okay.  Did you receive any subpoenas in
10  relation to Mr. Rosado's criminal case?
11    A.  I don't recall any.
12    Q.  Were you notified of the disposition of Mr.
13  Rosado's criminal case?
14    A.  Yes.
15    Q.  Do you recall who notified you?
16    A.  I believe it was the state's attorney in the
17  courtroom who was handling the case.
18    Q.  Okay.  If you could -- do you recall the date
19  that you were notified?
20    A.  I don't.
21    Q.  If you could turn to Exhibit 7, second page
22  -- Bates labeled FCRL 2170.  You can look towards the
23  bottom.  See your name and information there?
24    A.  I'm sorry, what --
25    Q.  I'm sorry.

Page 111

1    A.  Which number?  We're on different pages.
2    Q.  FCRL 002170, I believe it is the second page.
3    A.  Got it.
4    Q.  Do you see your information at the bottom of
5  that page?
6    A.  Yes.
7    Q.  And do you see where it says the date being
8  June 8th, 2016?
9    A.  Date of sentence?                    3:18:51
10    Q.  Yes.
11    A.  Yeah.
12    Q.  Do you recall if that was the date that you
13  were notified of the disposition?
14    A.  I don't recall if that was the -- the date,
15  but I was notified.
16    Q.  Okay.  Do you recall what the disposition of
17  his case was -- Mr. Rosado's case?
18    A.  Believe it was nolled, nolle pros.
19    Q.  Okay.  And then prior to the September 1st,
20  2015 arrest, had you made any other arrests in regards
21  to narcotics?
22    MS. ROMELFANGER: Objection to form.  You can
23  answer.
24    A.  In my career?
25    Q.  No, shortly prior.  Say, two months prior.

Page 112

1  Do you recall?
2    A.  I don't recall specifically if I had or not.
3    MS. HAYWOOD: Okay.  Last thing.  Mark this
4  as Exhibit --
5    RECORDER:  11.
6    MS. HAYWOOD: -- 11.
7    Q.  Here you go.  Oh, sorry, I have short arms.
8  Do you recognize this document?
9    A.  Yes.                              3:20:46
10    Q.  What is it?
11    A.  It appears to be a summary of the
12  interrogatories.
13    Q.  Okay.  And --
14    A.  My interrogatories.
15    Q.  Sure.  And if you could take a moment to look
16  through to this and see if there's anything you would
17  like to supplement or change, and then look up when
18  you're done, let me know.  Okay.  If you can turn to
19  the page after 16 that says, "Verification."  Is that
20  your signature?
21    A.  Yes, ma'am.                        3:24:18
22    Q.  Is this document a true and accurate copy of
23  what it purports to be?
24    A.  Yes.
25    Q.  Is there anything that you wanted to

1  supplement or change?
2      A.   No.
3          MS. HAYWOOD:  Okay.  Nothing further.
4              EXAMINATION
5  BY MS. ROMELFANGER:
6      Q.   I just have a couple follow-ups.  Officer
7  Mora, do you recall being asked a series of questions
8  about conversations you had on September 1st, 2015?
9      A.   Yes.
10     Q.   Okay.  And you stated that you spoke with
11 family members on September 1st, 2015, right?
12     A.   Correct.
13     Q.   Okay.  Just to clarify, did you speak to any
14 family members about Angel Rosado or anything involving
15 the Plaintiff's September 1st, 2015 arrest?
16     A.   No.
17     Q.   Okay.  And Plaintiff's Counsel also asked you
18 a series of questions regarding audio and video
19 recordings.  Do you recall those questions?
20     A.   Yes.
21     Q.   Okay.  Do you record your observations and
22 your surveillance, when you're conducting surveillance,
23 in other means, such as in writing?
24     A.   Sometimes.
25     Q.   Okay.  Would an example be in a report?

1      A.   Correct.
2      Q.   Okay.  And then Plaintiff's Counsel also
3  asked you a series of questions about when you were
4  conducting surveillance of the van that Angel Rosado
5  was in.  Do you recall those questions?
6      A.   Yes.
7      Q.   Okay.  And although you personally lost sight
8  of the van, did your team members always have constant
9  surveillance of the van?
10     A.   Yes.                          3:26:17
11     Q.   Okay.  And did you also -- when you first
12 observed Mr. Rosado get into the van, did you record
13 any other identifiers about the van, such as a license
14 plate number?
15     A.   I believe I communicated the description of
16 the vehicle and the license plate to team members.
17     Q.   Okay.  And then if you could look at Exhibit
18 6 for me one more time.  You testified earlier that the
19 charges that you see in Exhibit 6 were charges that you
20 decided on after meeting with your team members.  Do
21 you recall that testimony?
22     A.   Yes.
23     Q.   But were those charges also based on the
24 actions of Angel Rosado and the substances that were
25 recovered off of Angel Rosado on September 1st, 2015?

1      A.   Absolutely.
2      Q.   And then just one more question.  If you
3  could turn to Exhibit 7 for me, please.  Do you recall
4  being asked a series of questions about, specifically, FCRL 2155,
5  2193, and 2195?
6      A.   Some of them.                  3:28:05
7      Q.   Okay.  These appear to be handwritten notes,
8  right?
9      A.   Some, yes.
10     Q.   Okay.  Do you know who wrote these notes?
11     A.   I don't.
12     Q.   Okay.  Do you know when they were written?
13     A.   I do not.
14     Q.   Okay.  Do you know in what context these
15 notes were taken?
16     A.   I do not.
17         MS. ROMELFANGER:  Okay.  That's all I have.
18             EXAMINATION
19 BY MS. HAYWOOD:
20     Q.   Okay.  I have a brief follow-up.  You
21 mentioned earlier that -- you testified earlier on the
22 questions of -- that your counsel relayed that
23 sometimes you record your observations in writing, is
24 that correct?
25     A.   Correct.

1      Q.   And the example of that was a report, was
2  that correct?
3      A.   Correct.
4      Q.   Is that report something that happens after
5  -- that happens after your observations, or is it
6  something that happens while you're observing, when you
7  would record your observations in writing?
8      A.   Could be either.
9      Q.   So there's been times then while you're
10 observing, you have written your observations on --
11 on some kind of report or document?
12     A.   Typically, as a surveillance officer, I -- I
13 do not do that, but it's possible another team member
14 might.
15     Q.   Okay.  And then you testified earlier that
16 your team had constant surveillance on Mr. Rosado, is
17 that correct?
18         MS. ROMELFANGER:  Objection to the extent it
19 misstates prior testimony.  You can answer.
20     A.   From the point we initiated surveillance to
21 the stop, yes.
22     Q.   But you weren't with -- you were alone when
23 you were pursuing Mr. Rosado and observing Mr. Rosado,
24 is that correct?
25         MS. ROMELFANGER:  Objection to form.  You can

Page 117

1  answer.
2      A.  I was alone in a vehicle while conducting
3  surveillance, correct.
4      Q.  And then that surveillance consisted of
5  communicating with your team through a push to talk,
6  correct?
7      A.  Correct.                          3:30:32
8      Q.  And weren't with any of your team members
9  personally or physically, is that correct?
10     A.  Correct. They were not in the same vehicle.
11  I was --
12     Q.  Okay.
13     A.  I was alone in my vehicle.
14     Q.  And your only means of communication was
15  through this push to talk at that time, is that
16  correct?
17         MS. ROMELFANGER:  Objection to form. You can
18  answer.
19     A.  The push to talk is what we use to
20  communicate.
21     Q.  Okay.  And then you testified also earlier
22  that the charges was based on the actions of Mr. Rosado
23  as well as the substances procured from Mr. Rosado, is
24  that correct?
25     A.  Correct.

Page 118

1      Q.  However, just to clarify, you didn't
2  personally see the drugs on Mr. Rosado at the scene of
3  the September 1st, 2015 arrest, is that correct?
4         MS. ROMELFANGER:  Objection to form. You can
5  answer.
6      A.  At the Wallace location, I did not.
7      Q.  Okay.  And you did not learn that the
8  individual was Mr. Rosado until after his arrest, is
9  that correct?
10     A.  Correct.
11     Q.  Okay.  And this information about his arrest
12  was provided to you by your other team members, is that
13  correct?
14     A.  The information to his identity?
15     Q.  Identity, as well as the drugs procured.
16     A.  The -- the summary of the stop would have
17  been the enforcement officers. Again, I think I
18  mentioned that I'm not -- I don't recall who -- who
19  looked him up, or -- or who ran his name, or who first
20  announced his identity.
21     Q.  Okay.  And then the last question, the
22  Exhibit 7, you mentioned the state's attorney -- I
23  mean, I'm sorry, Exhibit 7, you -- you did not write
24  any of this, either twenty -- 2155, 2193, or 2195, is
25  that correct?

Page 119

1      A.  Can you state the numbers again?
2      Q.  I'm sorry --
3      A.  2155, I did not write.
4      Q.  -- 2155.  2193?
5      A.  93, I did not write.
6      Q.  And 2195?
7      A.  No.  I did not write that one either.    3:33:09
8      Q.  How would a state's attorney typically come
9  by this information that's recorded on Exhibit 7, those
10  Bates labels identified earlier?
11         MS. ROMELFANGER:  Objection to form and
12  foundation.  You can answer.
13     A.  I don't know if these are officers' notes or
14  state's attorney's notes.  I --
15     Q.  Okay.
16     A.  I don't know.  I --
17     Q.  Nothing further -- oh, I'm sorry.
18     A.  I -- they -- they appear to be state's
19  attorney's notes, but I -- I'm not sure.
20         MS. HAYWOOD:  Okay.  Nothing further.
21         MS. ROMELFANGER:  Nothing on that.  We'll
22  reserve.
23         RECORDER:  Off the record, 2:10 p.m.
24
25

Page 120

1
2                    CERTIFICATION
3      I certify that the foregoing is a correct
4      transcript from the record of proceedings
5           in the above-entitled matter.
6
7                  Lidia Gebrezgher
8                   April 26, 2018
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25