# AMENDED

# EXHIBIT D

Page 1

1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4 ------------------------------------------------------
5 Angel Rosado,
6
7        Plaintiff,
8
9    vs.                    Case Number 1:2017cv02210
10
11 Officer Abraham Mora et al.,
12
13       Defendants.
14 ------------------------------------------------------
15           Deposition of Scott Korhonen
16                      Tuesday
17                 April 3rd, 2018
18
19                       -at-
20
21           Shiller Preyar Law Offices
22           601 South California Avenue
23                 Chicago, Illinois
24
25

Page 2

1            APPEARANCES
2
3     For the Plaintiff:
4          Tia L. Haywood
5       Shiller Preyar Law Offices
6       601 South California Avenue
7        Chicago, Illinois 60612
8
9     For the Defendants:
10         Allison L. Romelfanger
11      City of Chicago Department of Law
12         30 North LaSalle Street
13              Suite 900
14         Chicago, Illinois 60602
15
16     Also present:
17         Roberto Delcid
18
19     RECORDER: Good morning. We are now on the
20 record. Today is Tuesday, April 3rd, 2017 (sic). The
21 time is now 10:09 a.m. We are located at Shiller
22 Preyar Law Offices, 601 South California Ave., Chicago,
23 Illinois, for a deposition in the matter of Angel
24 Rosado v. Officer Abraham Mora et al., case number
25 1:2017cv02210. The venue is Northern District of

Page 3

1 Illinois, Eastern Division. The witness today is Scott
2 Korhonen. Mr. Korhonen, my name is Brenda Portillo.
3 I'm a notary public, and I'm recording this deposition
4 on behalf of Exhibit 5, LLC. At this time, can you
5 please raise your right hand for the oath?
6         (Witness sworn)
7     RECORDER: Thank you. Would the attorneys
8 please state their appearances for the record?
9     MS. HAYWOOD: Tia Haywood on behalf of the
10 Plaintiff, Angel Rosado.
11     MS. ROMELFANGER: Allison Romelfanger on
12 behalf of the Defendants.
13     RECORDER: And would anyone else in the room
14 please state their appearance for the record?
15     MR. DELCID: Officer Delcid, D-e-l-c-i-d,
16 with Chicago Police Department.
17     RECORDER: That completes the required
18 information. We can proceed.
19              EXAMINATION
20 BY MS. HAYWOOD:
21    Q. Okay. Good morning, Officer Korhonen.
22    A. Yes.                        0:01:10
23    Q. Did I pronounce that correct? Okay. So have
24 you ever testified in a deposition before?
25    A. Yes.

Page 4

1    Q. Okay. So -- so you're pretty familiar with
2 the ground rules of the deposition?
3    A. It was a while ago, but I think so.
4    Q. Okay. So I'll just go over them briefly just
5 in case, just to refresh your memory. So I would ask
6 that you -- sorry. I would ask that you will wait
7 until I finish asking the question before you answer,
8 so it will be -- so that the court reporter can take
9 the -- take the response down accurately. Is that
10 fair?
11    A. Yes.
12    Q. And the court reporter can't understand
13 expressions such as "uh-huh," "uh-uh," or phrases such
14 as that, so please speak in a clear and loud voice for
15 the court reporter.
16    A. Okay.                       0:01:57
17    Q. Okay. And this deposition is being
18 videotaped, so I don't feel like we'll have that much
19 of a problem with that, but I'll start off with some
20 background information. Can you please state your full
21 name and spell it for the record?
22    A. Officer Scott Korhonen, K-o-r-h-o-n-e-n, star
23 number 2826, assigned to the Chicago Police Department,
24 currently in the bureau of organized crime, gang
25 investigations division.

Page 5

1  Q. Thank you for that introduction. And how
2  long have you been working with the Chicago Police
3  Department?
4     A. Approximately 19 years.
5     Q. And what is your current age, if I may ask?
6     A. 47.
7     Q. 47. Okay. And what is your employment
8  history, how long besides the -- have you worked
9  anywhere besides the Chicago Police Department?
10    A. Yes.
11    Q. Okay. What -- where else did you work?
12    A. I worked for the Cook County Sheriff just
13 prior, for just one year.
14    Q. You recall what years that was?
15    A. The -- the year prior to becoming a Chicago
16 police officer, '97.
17    Q. So it's fair to say from about 1996 to '97,
18 you worked with the Cook County Sheriff?
19    A. '97 to '98.                    0:03:12
20    Q. Oh, I'm sorry. Okay. '97, '98. And then
21 you've been a Chicago police officer since 1998?
22    A. Correct.
23    Q. Okay. And did you attend any -- any higher
24 education, secondary education?
25    A. Various local colleges, community colleges.

Page 6

1     Q. Okay. What were some of those colleges, if
2  you can recall?
3     A. Chicago colleges.
4     Q. Chicago --
5     A. Wright College, Triton College.
6     Q. Okay. Have you ever taken a polygraph for
7  your employ -- other employment?
8     A. No, I haven't.                 0:04:01
9     Q. And besides the Cook County Sheriff and
10 Chicago Police Department, are those the only two
11 places you were employed at?
12    A. I mean, I worked various other small jobs
13 prior to that.
14    Q. Okay. And have you ever sought promotions
15 with your position at the Cook County Sheriff?
16    A. No.
17    Q. How about have you ever sought any promotions
18 with your Cook -- with the Chicago Police Department?
19    A. Yes.
20    Q. What was the result?
21    A. You just take a test and you're put on a
22 list, so if they get to your number, they get to your
23 number.
24    Q. Have you been promoted since --
25    A. No.

Page 7

1     Q. -- you started? Okay. Okay. Do you have
2  social media accounts?
3     A. No, I do not.                  0:04:57
4     Q. Do you have any family members in the police
5  -- on the police force?
6     A. No, I do not.
7     Q. Okay. And I'm going to get into more of your
8  Chicago Police Department -- more of your Chicago
9  Police Department employment. Can you explain -- can
10 you describe for me what's the routine for doing
11 narcotic surveillance?
12       MS. ROMELFANGER: I'm going to object to
13 form. Vague. You can answer.
14    A. There's mobile surveillance, there's
15 surveillance from fixed positions, there is sometimes
16 just on view, while you're -- while you're driving, you
17 observe narcotics transactions.
18    Q. Okay. And when you say, "Fixed positions,"
19 are these positions that you are already -- are these
20 positions that you're assigned to, or are these
21 positions that you just know to go to, can you explain
22 that?
23    A. That could go both ways.        0:06:09
24    Q. Okay. Okay. And are you aware of the
25 routine for -- is there any routine for a gang

Page 8

1  surveillance, or is it the same?
2        MS. ROMELFANGER: I'm going to object to
3  form. Vague. You can answer.
4     A. It would probably pretty much be the same.
5     Q. Have you ever witnessed police misconduct?
6     A. No.
7     Q. Have you ever testified against a police
8  officer?
9     A. No.
10    Q. Okay. Okay. Had you ever been to 4710 South
11 Wallace prior to September 1st, 2015?
12    A. No, I was not.                  0:07:14
13    Q. Have you been there since?
14    A. No, I have not.
15    Q. Okay. Had you been to the area of Diversey
16 and Monticello in Chicago, Illinois prior to September
17 1st, 2015?
18    A. I'm sure I have, through the course of my
19 career, traveled in that area or past, yes.
20    Q. Have you been there since?
21    A. No, not that I can recall.
22    Q. Okay. Had you ever met the Plaintiff in this
23 case, Angel Rosado, prior to September 1st, 2015?
24    A. No, I have not.
25    Q. Had you ever met Alexander Soliveras prior to

Page 9

1  September 1st, 2015?
2      A. No, I have not.                           0:08:15
3      Q. Have you met either of them since?
4      A. No, I have not.
5      Q. So you testified earlier that you have been
6  to the area around Diversey and Monticello. Is that
7  fair to say?
8      A. Well I used to work in the 25th district, and
9  that's an area we still cover, so we may have driven
10 through that area.
11     Q. Okay. How about 47th and South Wallace, that
12 area?
13     A. I don't --
14     Q. Are you familiar with that?               0:08:58
15     A. I mean, I'm familiar with the -- the area,
16 but I don't remember going back to that area at all,
17 no.
18     Q. Have you ever made any arrest in either
19 neighborhood before, that you can recall?
20     A. I'm sure around the Diversey and Monticello
21 area, I've made arrests sometime during the course of
22 my career.
23     Q. Okay. Had you ever execute any search
24 warrants pertaining to narcotics, prior to September
25 1st, 2015, in either neighborhood?

Page 10

1      A. I'm sure I have.
2      Q. You don't recall the specifics?
3      A. No, I do not.
4      Q. Have you ever been accused of lying?
5      A. No, I don't believe so.                  0:10:02
6      Q. Have you ever lied on a job application?
7      A. No, I have not.
8      Q. How about in a job interview?
9      A. No, I have not.
10     Q. Okay. Are you aware of anyone who is of the
11 opinion that you are dishonest?
12        MS. ROMELFANGER: Objection. Foundation.
13 You can answer.
14     A. No.
15     Q. Okay. As far as warrants are concerned,
16 specifically pertaining to narcotics, are you -- let's
17 see, how many -- do you recall how many or around about
18 you have participated in?
19        MS. ROMELFANGER: Objection to form. You can
20 answer.
21     A. Do you mean, like, taken part in search
22 warrant executions?
23     Q. Yes.                                     0:11:01
24     A. Is that what you mean? Oh, I -- a lot, I
25 couldn't even tell you how many.

Page 11

1      Q. Do you have around about?
2      A. I couldn't even give you around about, it's
3  -- there's a lot. I mean, we assist other teams, we --
4  you know.
5      Q. Okay. Do you recall how many warrant
6  applications you've been the affiant for?
7      A. Not exactly, but a fair amount.
8      Q. What would you say -- what does "a fair
9  amount" mean to you?
10     A. 50 to 100, I could guess, over the course of
11 my career.
12     Q. Okay. And how many of those do you -- if you
13 can recall, dealt with drugs?
14     A. I couldn't even give you a -- you know, I
15 would -- I would guess more than half.
16     Q. Are you assigned to a special unit at the
17 Chicago Police Department?
18     A. Yes.                                     0:12:12
19     Q. What unit is that?
20     A. Gang investigations division.
21     Q. And what is your typical responsibilities in
22 the gang investigation unit division?
23     A. Focus on targeted areas for -- known for gang
24 and drug problems and long term operations.
25     Q. And when you say, "Targeted areas," are you

Page 12

1  assigned -- is it fair to say you're assigned to a
2  specific area, or how are your assignments?
3      A. It could go both ways. It could be somewhere
4  that you recognize as having problems in the community
5  with ongoing gang conflicts, or it could be something
6  that your supervisor has asked you to go and look into.
7      Q. How do you determine which areas are
8  targeted?                                       0:13:20
9      A. I would probably say, typically, based on the
10 amount of shootings and homicides occurring in a
11 specific area.
12     Q. Okay. Okay. And -- and when your supervisor
13 gives you assignments, how does that process work?
14     A. I'm not sure how they gain their -- you know,
15 how they're made aware of the situation or the area,
16 but they would just notify one of our supervisors that,
17 you know, there may be some sort of ongoing conflict
18 between gangs in a certain area, to maybe pay attention
19 to that area to see if you can deter any violence
20 that's occurring.
21     Q. Are you guys assigned in teams when you're
22 given these assignments?
23     A. Pretty much, yes.                        0:14:20
24     Q. What consists of a team?
25        MS. ROMELFANGER: Objection to the form. You

Page 13

1  can answer.
2      A.  It would be a sergeant and how many ever POs
3  he would have on his team.
4      Q.  Okay.  And on September 1st, 2015, were you
5  assigned to a team?
6      A.  Yes.
7      Q.  And who -- was there a sergeant on that team?
8      A.  I'm sure we had a sergeant, yes.
9      Q.  Okay.  Okay.  Are you currently looking for
10 any other employment?
11     A.  No.                              0:15:14
12     Q.  Satisfied with your employment with the
13 Chicago Police Department?
14     A.  Yes.
15     Q.  Okay.  What do you like most about your job?
16     A.  There's a lot of things I like about my job.
17 You have to like your job.  I mean, I -- I like doing
18 what I do.
19     Q.  Okay.  What do you like least about your job?
20     A.  There's really not too much I can say that I
21 don't really like about this job.  I like it.
22     Q.  Okay.  Did you review any documents in
23 preparation for today?
24     A.  Yes.                             0:16:05
25     Q.  What documents were those?

Page 14

1      A.  I believe it was our interrogatory and maybe
2  our supplemental report.
3      Q.  Okay.  Did you review any photos?
4      A.  No, I did not.
5      Q.  Any videos?
6      A.  No, I did not.
7      Q.  And no audio --
8      A.  No, I did not.
9      Q.  Okay.  Did you review anything else aside
10 from interrogatories and your supplemental report?
11     A.  Today, no.
12     Q.  Okay.  And have you had any conversations
13 regarding this lawsuit or your deposition to fellow --
14 any fellow -- with any fellow officers?
15         MS. ROMELFANGER:  I'm going to object as to
16 the extent that any of those conversations were in my
17 presence or in the presence of any of the other
18 attorneys on this case.  You can answer to the extent
19 that they weren't in --
20     A.  No, just --
21         MS. ROMELFANGER:  -- the presence of your
22 attorneys.
23     A.  Just with Counsel.                0:17:06
24     Q.  Okay.  So safe -- it's fair to say you didn't
25 have any conversation with any partner, girlfriend, or

Page 15

1  friends?
2      A.  That would be fair to say.
3      Q.  Okay.  Just your counsel?
4      A.  Present with Counsel, yes.
5      Q.  Okay.  Okay.  Had you -- I apologize for
6  this, I have to ask everyone this.  Had you taken any
7  drugs or alcohol within 24 hours of the September 1st,
8  2015 incident?
9      A.  No.
10     Q.  This deposition -- within 24 hours of this
11 deposition today?
12     A.  No, I have not.
13     Q.  Okay.  Do you recall who were the other
14 officers on the team on September 1st, 2015, or your
15 team?
16     A.  I -- I believe I remember their names, yes.  0:18:08
17     Q.  Okay.  Can you tell me who they are -- who
18 they were?
19     A.  Officer Mora, Officer Apacible, Officer
20 Baldassano, Officer Heyden, and Officer Delcid.
21     Q.  Do you recall if either one of them is a
22 sergeant or was the sergeant?
23     A.  Those are all patrol officers, patrolmen.
24     Q.  Okay.  Okay.  How long had you known Officer
25 Mora?

Page 16

1      A.  I think maybe eight years, ten years.
2      Q.  How about Officer Apacible?
3      A.  Apacible?                         0:19:08
4      Q.  Hope I'm saying that correctly.
5      A.  Roughly about the same time, eight to ten
6  years.
7      Q.  And Officer Baldassano?
8      A.  Maybe three or four years.
9      Q.  Officer Heyden?
10     A.  Heyden, about -- I have to guess about six,
11 seven years.
12     Q.  And Officer Delcid?
13     A.  Maybe about -- about five years maybe.
14     Q.  Okay.  Do you socialize with any of these
15 officers outside of work?
16     A.  Not really, no.
17     Q.  Do you know their family and friends?   0:19:55
18     A.  Just through conversations amongst, you know,
19 ourselves.
20     Q.  So it's safe to say you never met any of
21 their family members or friends?
22     A.  I may have briefly met them once or twice.
23     Q.  Okay.  Are any of the officers you listed
24 assigned as a partner to you?
25     A.  Yes.

Page 17

1  Q.  Which officer?
2  A.  Officer Delcid is my primary partner.  0:20:34
3  Q.  So is it safe to -- when you say, "Primary
4  partner," is it safe to say that sometimes you get
5  assigned a different partner?
6  A.  If your partner goes on vacation or
7  something, you may have someone else you're working
8  with.  It could be any one of the other officers.
9  Q.  Okay.  Okay.  Have you had any trainings on
10  narcotics surveillance?
11  A.  I don't recall if I had official training on
12  narcotics surveillance.
13  Q.  Okay.  How about on gang surveillance?  0:21:29
14  A.  It would be the same, I really couldn't
15  recall if I have or --
16  Q.  Any trainings on searches for narcotics, so
17  it would be search warrants for narcotics?
18  A.  I believe I've been to a search warrant class
19  before.
20  Q.  So you believe you had maybe one or two
21  classes, or can you --
22  A.  I couldn't tell you exactly, but I believe I
23  -- I've been to a search warrant class before.
24  Q.  And do you -- are you familiar with the
25  narcotics -- are you familiar with the narcotics

Page 18

1  surveillance protocol, any protocols?
2      MS. ROMELFANGER:  Just going to object to
3  foundation and not here as 30(b)(6).  You can answer.
4  A.  Can you explain what you mean by that?  0:22:23
5  Q.  Like, are you aware of any policies or
6  protocols regarding narcotics surveillance?
7      MS. ROMELFANGER:  Same objection to
8  foundation and not here as 30(b)(6).  You can answer.
9  A.  I don't believe there is any policies for
10  narcotics surveillance.
11  Q.  Okay.  How about for searches?
12      MS. ROMELFANGER:  Same objection to
13  foundation and not here as 30(b)(6).  You can answer.
14  A.  Policy?  I don't think there's a policy.  I'm
15  not sure what you mean by that, but --
16  Q.  So how about for any policy or protocol for
17  warrantless searches?
18      MS. ROMELFANGER:  Same objection to
19  foundation and not here as 30(b)(6).  You can answer.
20  A.  So I'm saying to obtain arrest warrants or
21  search warrants, what do you mean?
22  Q.  So for this one, it would be search warrants.  0:23:09
23      MS. ROMELFANGER:  Same objection.  Foundation
24  and not here as 30(b)(6).  You can answer.
25  A.  For search warrants, I -- I mean, I've

Page 19

1  written search warrants.  I know there is -- you know,
2  you have to establish probable cause, yes.
3  Q.  And how about for arrest warrants, are you
4  aware of any policies and protocols regarding arrest
5  warrants?
6      MS. ROMELFANGER:  Same objection.
7  Foundation.  Not here as 30(b)(6).  You can answer.
8  A.  I'm not sure if there is a policy for that.
9  I'm not sure.
10  Q.  Okay.  And generally speaking, what is the
11  first thing that occurs when you are on surveillance
12  for narcotics activity or gang activity?
13      MS. ROMELFANGER:  Objection to form.  Vague.
14  You can answer.
15  A.  To establish a surveillance you mean?
16  Q.  Yes.  0:24:06
17  A.  To establish a surveillance, I guess you
18  would just go to a known area for drug sales or -- I
19  guess there's a lot of scenarios you could -- you could
20  use for that.  I mean, if you are getting complaints
21  that a specific location being a house or a problem
22  corner in the community has drug sales ongoing, you
23  would attempt to find a location to hide yourself, the
24  surveillance officer would, and observe what -- what is
25  taking place out there.

Page 20

1  Q.  And what do you typically wear when you are
2  on these gang or drug surveillance?
3  A.  Typically, it would be in plain clothes, I
4  would -- I would guess.
5  Q.  Okay.  So a typical day for you would be you
6  would go to an area known for drug sales or an area
7  that you received a complaint, and you would, in a
8  sense, hide yourself.  Can you describe what you mean
9  by "hide yourself"?
10  A.  I guess to be clear for you, if you receive
11  complaints of a problem corner or a house that they may
12  be selling drugs from, you would attempt to use
13  whatever you could use to hide yourself to make the
14  observations for yourself and verify the information.
15  That could be done in plain clothes, that could be done
16  using a covert vehicle.  I mean, sometimes in the
17  communities, landlords are tired of seeing stuff, and
18  if there is vacant properties in their buildings, they
19  may let you go in those.
20  Q.  Okay.  And then let's -- okay.  So generally
21  speaking, when you would hide yourself after you go to
22  this problem area, if you were to see a transaction,
23  what would be the next step that you would take?
24  A.  There -- there are so many variables.  It
25  could be an ongoing investigation where you're just

Page 21

1  making these observations over a course of time and
2  documenting, to, you know, build your cases, if it's,
3  for example, a house and you want -- you know, trouble
4  housing to have the information, I mean, thee --
5  there's a lot of variables that go into that, so.
6      Q.  Okay.  So if it wasn't long surveillance, I
7  believe you described it as -- you can correct me if
8  I'm saying it incorrectly, if it wasn't, like, a type
9  of situation where you're trying to build up evidence,
10 but you were at a problem corner and you saw a drug
11 transaction, what would be the next step you would
12 take?
13     A.  You could -- if you have other members of
14 your team out there with you and you want to conduct a
15 field interview, you could ask your enforcement vehicle
16 to do that for you.
17     Q.  And what is a purpose of the field interview?   0:27:56
18     A.  I mean, most of the time, if surveillance
19 officers see what they believe is narcotics
20 transactions going on, they would ask for the
21 enforcement vehicle to approach them, and they would
22 have explained their observations to the enforcement
23 vehicle, and the enforcement officers would investigate
24 whether or not the person -- you know, why they're in
25 the area, see if they have any drugs on their person,

Page 22

1  and if so, probably arrest them.
2      Q.  Okay.  So the -- the way I'm understanding it
3  is there is two separate teams, and one team is an
4  enforcement team, and the other team is an observation
5  team.  Is that fair to say?
6      A.  Pretty much.  I mean, you could say that, I
7  guess.
8      Q.  Okay.                                          0:28:59
9      A.  There is officers that fill those roles,
10 different officers fill different roles.
11     Q.  Okay.  And then when the observation team
12 theoretically observes a drug transaction that you're
13 not trying to build a case upon, they would call the
14 enforcement team, and the enforcement team would come
15 in for the field interview.  Is that fair to say?
16     A.  Yeah, they would -- they would notify, yes,
17 the enforcement officers.
18     Q.  Okay.  Sorry.  And so it's the enforcement
19 officers that's actually investigating or speaking with
20 the suspect?
21     A.  At that point --
22     Q.  Or --
23     A.  -- it would probably be, yes.               0:29:44
24     Q.  Okay.  And what is the observation team, at
25 that point, doing or supposed to be doing?

Page 23

1          MS. ROMELFANGER:  Objection to form.
2  Foundation.  You can answer.
3      A.  Most of the time, they verify that the person
4  we're conducting or encountered with is the same person
5  that they observed their observations with, and they
6  will be in very close proximity watching us.
7      Q.  How many members is typically on the
8  enforcement team?
9          MS. ROMELFANGER:  Objection to the form.  You
10 can answer.                                           0:30:31
11     A.  That could change from day to day, but
12 sometimes it's one car for enforcement, and sometimes
13 it's two for enforcement.
14     Q.  And how many members on the observation team?
15     A.  Objection to form.  Vague.  You can answer.
16     A.  It would be usually one -- one officer per
17 vehicle.
18     Q.  And how does the officer on the observation
19 team get in touch with the officers on the enforcement
20 team?
21     A.  Through --
22         MS. ROMELFANGER:  Objection to the form.
23 Vague.  You can answer.
24     A.  Through, like, two-way radios.
25     Q.  Are these radios recorded?                     0:31:28

Page 24

1      A.  I don't -- I don't know, but I don't think
2  so.
3      Q.  Are any of the vehicles for the enforcement
4  team or the observation team, do those have any
5  recording devices?
6          MS. ROMELFANGER:  Objection to foundation and
7  form.  You can answer.
8      A.  The vehicle itself, I don't believe our
9  vehicles are fitted with cameras.  It's not uncommon
10 though that sometimes, during our long term operations,
11 we'll use video cameras to record observations.
12     Q.  What kind of video cameras do you -- do you
13 use?
14     A.  I'm not a surveillance person, so I really
15 couldn't tell you that.
16     Q.  Had you ever seen someone on the surveillance
17 team use these video cameras before?
18     A.  Yeah.                                          0:32:28
19     Q.  Can you describe what the -- what type of
20 cameras they are?
21     A.  It would be similar to, like, what you're
22 using today.
23     Q.  Okay.  So fair to say, like, a handheld --
24     A.  Yeah, portable.
25     Q.  Okay.  And what would the surveillance -- the

Page 25

1  person -- the officer on the surveillance team do with
2  that video footage?
3      MS. ROMELFANGER: Objection to foundation.
4  You can answer.
5      A. During our investigations, a lot of times, it
6  will be saved to a disk and inventoried for the -- the
7  ongoing case.
8      Q. Okay. What is your understanding of what you
9  are permitted to do during warrantless search and
10 arrest for narcotics?
11     A. What is permitted to do?                0:33:39
12     Q. Yes, what is your understanding of?
13     A. I mean, I believe if you have probable cause
14 and you can stop the person and articulate why you're
15 stopping that person, you believe they may have weapons
16 or thing like that on them, you can conduct a
17 protective pat down of that person, ask them for their
18 identity.
19     Q. Okay. So it's fair to say that -- had you
20 ever done any surveillance for gang activity or
21 narcotics?
22     A. I have, yes, in the past.
23     Q. But it's fair to say mostly you're on the
24 enforcement team, if I'm understanding --
25     A. Primarily, yes.

Page 26

1      Q. Okay. Okay. And you -- are you currently on
2  the gang investigation unit 193?
3      A. Yes.                                  0:34:47
4      Q. Okay. And do you know how many members is on
5  this investigation unit?
6      A. I couldn't -- I could give you a rough guess.
7  That's about it.
8      Q. What will be your rough guess?
9      A. Maybe 200 in our unit.
10     Q. 200. Okay. Are there any special trainings
11 or requirements to qualify to be on this special gang
12 unit?
13     A. I don't know if there is -- I know there's
14 some criteria for having experience or amount of years
15 on the job, but I'm not sure what the actual criteria
16 is.
17     Q. Okay. And then when you -- can you describe
18 the process for booking an arrestee that you guys have
19 found probable cause, as you described earlier, to
20 arrest a person for gang or narcotic activity?
21     MS. ROMELFANGER: Objection to the form.
22 Vague. You can answer.                        0:36:00
23     A. Again, there can be different situations, but
24 primarily, if we arrest someone in the -- in the area
25 we worked on kind of a regular basis, the person will

Page 27

1  be brought to Homan and Fillmore, to the police station
2  there. He will be signed into a book, and he will be
3  given -- given a holding cell, which is notated in the
4  book, and usually, he'll be asked if he needs to use
5  the washroom, needs anything to drink, anything to eat,
6  and then we go begin our processing, which is arrest
7  report, case report. Once that's complete, he will
8  then be brought to the 11th district for his final
9  processing being his fingerprints and mugshot.
10     Q. Okay. To your knowledge, has any person
11 claimed you fabricated evidence?
12     A. I don't think so, no.                  0:37:04
13     Q. Okay. To your knowledge, has anyone -- any
14 person claimed that any of the other police officers
15 that you mentioned earlier, the -- which I'll say Mora,
16 Heyden, Baldassano, Apacible --
17     A. Close enough.
18     Q. -- all right, Delcid fabricated or planted
19 any evidence?
20     A. I don't believe anyone fabricated evidence,
21 no.
22     Q. Have you ever been a party to a lawsuit?
23     A. Yes.
24     Q. Do you recall where?
25     A. Where as in, like, the location --

Page 28

1      Q. The --
2      A. -- it happened?
3      Q. Yes, sir.                             0:38:00
4      A. I don't remember the exact address. I know
5  one was in -- I think they were in the 11th district --
6  police district.
7      Q. Okay. Is that the district you are assigned
8  to?
9      A. We're not assigned, we're -- we're a city
10 wide unit, so we go wherever we need to go.
11     Q. Okay. Do you recall when you were parties to
12 the -- party to a lawsuit?
13     A. I've been on a few. I think the earliest was
14 2004, I think, then the most recent, maybe two years
15 ago, three years ago was another one.
16     Q. Okay.
17     A. And then this lawsuit, and there is also
18 another lawsuit that somehow we're involved in that we
19 were just notified on.
20     Q. Okay. Do you recall what the results of
21 those lawsuits were -- was?
22     A. Yes. Okay?                            0:39:16
23     Q. What -- what was the result?
24     A. One, we went to trial, and we lost. That was
25 the one in 2004.

Page 29

1  Q.  Okay.
2  A.  Another one we had and it was dismissed by
3  the judge for some reason, I don't know what that was
4  for, this one, and we were just named on another one.
5  Q.  Okay.  Were you found liable in that -- in
6  the lawsuit in 2004?
7  A.  I think it was a settlement, so I don't know
8  if that's considered liable, but --
9  Q.  Okay.  Do you recall the name of the
10 plaintiff in the lawsuit?
11 A.  On -- on that one, it was Coffie, on the one
12 that was thrown out was, I think, Lewis, if I remember
13 right, this one, and the new one is Allen, I believe.
14 Q.  Okay.  Had you ever had to pay punitive
15 damages in any of these suits?
16 A.  No, I did not.                    0:40:35
17 Q.  Well I would just be referring to the 2004,
18 since that's the only --
19 A.  I did not.  That was a settlement.
20 Q.  Okay.  And do you recall what the allegations
21 in the Coffie suit, I believe it was, the 2004 suit?
22 A.  Yes.
23 Q.  What was those allegation?
24 A.  Unlawful search, I believe.
25 Q.  Okay.  How about the Lewis suit that was

Page 30

1  dismissed?
2  A.  I don't remember what his allegation was --
3  Q.  Okay.
4  A.  -- to be honest.
5  Q.  And then how about the Allen suit?
6  A.  That's so new, I -- I don't -- I don't know
7  that one either.
8  Q.  Okay.  You were just notified on that --
9  A.  Right.
10 Q.  Okay.
11 A.  That was recent.
12 Q.  Okay.                             0:41:25
13 A.  It was a search warrant of his residence.
14 That's all I can tell you.
15 Q.  Okay.  Had you -- so it's fair to say you've
16 testified in court a lot?
17 A.  Yeah, I testify pretty -- pretty regular in
18 court.
19 Q.  Where do you mostly testify, which court
20 building, the location do you --
21 A.  Most -- most common would probably be 26th
22 and California.
23 Q.  Okay.  How often would you say you testify?
24 A.  That's a hard one.  Maybe once a month.
25 Q.  Okay.                             0:42:21

Page 31

1  A.  Sometimes it could be more.  It all depends
2  on how the case dates fall.
3  Q.  Okay.  How about in federal court?
4  A.  No, I haven't testified a lot in federal
5  court.
6  Q.  Okay.  Had you ever been charged with a crime
7  before?
8  A.  No, I have not.
9  Q.  Had you ever been arrested?
10 A.  No, I have not.
11 Q.  So it's fair to say you haven't been
12 convicted of any crime as well, right?
13 A.  Correct.
14 Q.  Okay.  Do you have a view on lawsuits against
15 police officers in general?
16 A.  Somewhat.                         0:43:14
17 Q.  What would be your viewpoint?
18 A.  That a lot of them are unnecessary.
19 Q.  Okay.  You believe it's too easy to file a
20 lawsuit?
21 A.  I won't say it's too easy.  I just think
22 maybe there should be more investigation done before
23 being able to do that.
24 Q.  Okay.  Does it bother you that you are being
25 sued?

Page 32

1  A.  Yeah, I would say it does somewhat.
2  Q.  Had you had a chance to read the complaint in
3  this case?
4  A.  I believe I did.                  0:44:11
5  Q.  Do you read all of the complaints filed
6  against you?
7  A.  All --
8     MS. ROMELFANGER:  Objection to form.  You can
9  answer.
10 A.  What do you mean, "complaints," like --
11 Q.  So you mentioned earlier that you have been
12 sued in other lawsuits, so do you read all those --
13 A.  I try to.  I try to.
14 Q.  Is there anything that you did during -- is
15 there anything that you did during this investigation
16 that led to the search and arrest of the Plaintiff in
17 this case that you regret?
18 A.  Regret?  No, this was a lawful arrest.   0:45:04
19 Q.  Okay.  Is there anything you ever done on the
20 job that you regret with your -- the job being the
21 Chicago -- Chicago police officer?
22    MS. ROMELFANGER:  Objection to form.  You can
23 answer.
24 A.  No, I -- I pride myself on my work.
25 Q.  What was your role in the search and arrest

Page 33

1  of Mr. Rosado on September 1st, 2015?
2      A.  We were the enforcement car.
3      Q.  How many people were in the enforcement car
4  with you?
5      A.  Myself, Officer Delcid, and Officer Heyden.
6      Q.  Okay.  Was there any briefing done in this
7  case for this investigation?
8          MS. ROMELFANGER:  Objection to form.  Vague.
9  You can answer.                              0:46:08
10     A.  No, I don't think there was a briefing done,
11 no.
12     Q.  Did you personally radio any information
13 related to Mr. Rosado on September 1st, 2015?
14     A.  What do you mean by -- "to Mr. Rosado," you
15 said?
16     Q.  No, radio in -- oh, radio in over any
17 information regard --
18     A.  I don't remember if I radioed in information
19 or not.
20     Q.  How about did you radio in any information on
21 Mr. Soliveras, Alexander Soliveras?
22     A.  I don't believe I did, but I don't recall to
23 be for sure.
24     Q.  Okay.  Did you subsequently -- do you recall
25 if you radioed in any information on either Mr. Rosado

Page 34

1  or Mr. Soliveras at any point on September 1st, 2015?
2      A.  I couldn't recall to be 100 percent honest
3  with you.
4      Q.  Okay.  Do you recall if someone else radioed
5  in any information regarding Mr. Rosado or Mr.
6  Soliveras?
7      A.  When you say, "Radioed in," are you meaning
8  to, like, our dispatch or --
9      Q.  Well the dispatch or you testified earlier
10 that, during your surveillance, you would have the
11 radio walkie-talkies, I believe, is --
12     A.  Okay.  I'm understanding you're saying -- I'm
13 under the interpretation you mean dispatch.
14     Q.  Okay.                                0:47:57
15     A.  The walkie-talkies between us and
16 surveillance, I may have, I may not have.  I think, you
17 know, I couldn't tell you for sure.
18     Q.  Okay.  So do you recall did -- if another
19 police officer radioed in any information to dispatch
20 on Mr. Rosado or Soliveras?
21         MS. ROMELFANGER:  Objection to foundation.
22 You can answer.
23     A.  I think the only time there was radio
24 communication to dispatch was probably for the
25 transport --

Page 35

1      Q.  Do you --
2      A.  -- after the time of arrest.
3      Q.  Oh, sorry.  Okay.  And do you recall who
4  radioed that in?
5      A.  That, I don't remember.  I'm sorry.    0:48:41
6      Q.  Okay.  And do you know -- do you recall who
7  radioed in information on Mr. Alexander Soliveras or
8  Rosado over the walkie-talkies, if anyone?
9      A.  I couldn't tell you exactly, it could be
10 anyone that was participating, you know, talking back
11 and forth.
12     Q.  Okay.  Do you recall any of the conversations
13 between you or other police officers over the
14 walkie-talkies?
15         MS. ROMELFANGER:  Objection to form.  Are you
16 talking about this specific night in question?
17         MS. HAYWOOD:  Yeah.  September 1st, 2015.  0:49:34
18     A.  I don't remember exactly what was said.  I
19 know there was obviously something that led to us
20 stopping them and conducting our investigation.  I'm --
21 I do know it had to be a lot of directions on which way
22 the person was going.
23     Q.  Okay.  Did you personally run a search on Mr.
24 Rosado or Mr. Soliveras on September 1st, 2015?
25     A.  I believe I'm -- I did.

Page 36

1      Q.  Do you recall which one?
2      A.  It may have been both.
3      Q.  Okay.
4      A.  When you say that, you mean, like, a computer
5  inquiry search, correct?
6      Q.  Yes.
7      A.  Okay.                                0:50:30
8      Q.  Do you know if anyone else ran a search, a
9  computer search?
10     A.  I couldn't answer that for you.
11     Q.  Okay.  Let's see.  On the -- on September
12 1st, 2015, do you recall if anyone had any recording
13 devices on their person or in the vehicles?
14     A.  I know we did not, as enforcement vehicle, I
15 -- I don't believe I did, no.
16     Q.  Did you see any of the -- any handheld
17 cameras on any other --
18     A.  I don't believe they did.
19     Q.  Okay.  Did you personally see the drugs
20 procured from Mr. Rosado?
21     A.  I did not.                           0:51:32
22     Q.  At any point during the September 1st, 2015
23 arrest, did you see the drugs at all?
24     A.  At any time during the arrest?
25     Q.  Yes.

Page 37

1   A.   I want to say probably once we were in -- in
2  our station, I did.
3   Q.   Can you describe them?
4   A.   I don't recall offhand -- remember exactly
5  what it was like.
6   Q.   Okay. Did you see any police officer procure
7  any drugs from Mr. Alexander Soliveras?
8   A.   I don't think so.                    0:52:31
9   Q.   Did you personally procure any drugs from Mr.
10 Alexander Soliveras --
11  A.   No.
12  Q.   -- on September 1st, 2015?
13  A.   He did not have drugs. I don't believe that
14 he -- he was never arrested.
15  Q.   And it's -- is it safe to say you did not
16 procure any drugs from Mr. Rosado on September 1st,
17 2015?
18  A.   That's correct.
19  Q.   And just to clarify, you testified earlier
20 you do not recall who procured the drugs, or do you
21 recall who procured the drugs from Mr. Rosado on
22 September 1st, 2015?
23      MS. ROMELFANGER: Just going to object to
24 extent that misstates prior testimony. You can answer.
25  A.   Officer Heyden, I believe, did.       0:53:22

Page 38

1   Q.   Okay. Did you hear any conversations between
2  any of the police officers and Mr. Rosado on September
3  1st, 2015?
4   A.   Conversations, no. I'm not quite sure what
5  you mean of "conversations."
6   Q.   So conversations, did you hear any comments
7  made to Mr. -- Mr. Rosado or Mr. Rosado make any
8  conversation -- I mean, any comments to a police
9  officer?
10  A.   No.                                   0:54:01
11  Q.   Okay. How about did you hear any comments
12 made from Mr. Soliveras to a -- the police officer or a
13 police officer back to Mr. Soliveras on September 1st,
14 2015?
15  A.   I'm sure there were conversations with Mr.
16 Soliveras.
17  Q.   Do you recall what those -- some of those
18 comments or or the conversations were?
19  A.   I don't recall, to be honest with you.
20  Q.   Okay. Do you recall who made the -- the
21 comments --
22  A.   I'm thinking I -- I'm thinking I -- I
23 approached Mr. Soliveras, so it may have been myself,
24 my partner, Officer Delcid, but I think it was more
25 along the lines of identifying who he was and things of

Page 39

1  that nature.
2   Q.   Okay. Okay. Were you aware that the search
3  and arrest was being recorded?
4   A.   No.                                   0:55:19
5   Q.   Who made the call for Mr. Rosado and Mr.
6  Soliveras to be arrested?
7   A.   Who made the call?
8   Q.   Yes.
9   A.   I mean, I think once it was learned that Mr.
10 Rosado was in possession of an ounce of cocaine, he was
11 placed under arrest. I think just the officer who
12 recovered it told us, you know, he was under arrest for
13 possession, and that would be pretty much how that
14 would go.
15  Q.   So based on what you testified earlier, it's
16 fair to say that would be Officer Heyden?
17  A.   Heyden, yes.                          0:56:20
18  Q.   Okay. And it's fair to say that the basis
19 for probable cause would be the possession of the
20 substances that Heyden procured from Mr. Rosado on
21 September 1st, 2015?
22      MS. ROMELFANGER: Objection to the extent
23 that misstates prior testimony. You can answer.
24  A.   That would be pretty much fair to say, yes.
25  Q.   Do you know who made the call to release Mr.

Page 40

1  Soliveras?
2   A.   I think I -- I don't know who actually made
3  that determination. I think for -- for some reason, if
4  I remember it right, I thought he had a warrant or
5  something, then it was determined he didn't have a
6  warrant, I think.
7   Q.   Okay. Do you recall who transported Mr.
8  Rosado on September 1st, 2015?
9   A.   It was -- it was ninth district personnel, I
10 think -- ninth district was --
11  Q.   Do you recall who transported Mr. Soliveras?   0:57:42
12  A.   I don't. I think they went both together, I
13 think.
14  Q.   Okay. Were there any pictures taken at the
15 scene of the September 1st, 2015 arrest?
16  A.   Pictures, no.
17  Q.   Do you recall who held onto the drugs
18 procured from the September 1st, 2015 arrest?
19  A.   Officer Heyden.
20  Q.   Can you describe the chain of custody of the
21 drugs procured at the September 1st, 2015 arrest?
22  A.   I couldn't. We'd have to ask Officer Heyden
23 that.
24  Q.   Did you have any further interaction with Mr.
25 Rosado or Mr. Soliveras after the September 1st, 2015

Page 41

1 arrest?
2    A. I've never seen them since, no.    0:58:54
3    Q. Were you personally aware that Mr. Rosado was
4 on parole on September 1st, 2015?
5    A. I think he made Officer Heyden aware of that.
6    Q. Do you know who called Mr. Rosado's parole
7 officer as a result of the September 1st, 2015 arrest?
8    A. It -- I'm not for certain. It may have been
9 -- I'm not for certain. It may have been Officer Mora.
10 I don't -- I'm not sure.
11    Q. And is it the typical policy to contact an
12 arrestee's parole officer as a result of an arrest?
13        MS. ROMELFANGER: Objection to foundation.
14 Not here as 30(b)(6). You can answer.
15    A. If you -- if you typically arrest someone who
16 is on parole, at least in Illinois, when his name check
17 comes up showing that he's on parole, it will -- it
18 will direct you to call parole.
19    Q. How soon after the arrest is an arrestee's
20 parole officer contacted typically?
21    A. Within a short time. I would say within --
22 within the time of processing. If -- sometimes when
23 you don't receive response back, the district where
24 he's placed in a holding cell during his final
25 processing, they will also notify parole.

Page 42

1    Q. And do you know is it's -- is it Chicago
2 Police Department policy to take all arrestees to Homan
3 Square?
4    A. Policy?    1:01:02
5        MS. ROMELFANGER: Objection to foundation.
6 Not here as 30(b)(6). You can answer.
7    A. I mean, that's where we work. That's where
8 our offices are, that's where our police facility is,
9 so we process our arrestees there, but I -- I'm
10 assuming that wherever the officers work, they will
11 process them in their respective districts.
12    Q. Okay. How is an arrestee processed at Homan
13 Square?
14        MS. ROMELFANGER: Objection to form. Vague.
15 You can answer.    1:01:38
16    A. Once you're brought to Homan Square as an
17 arrestee, you're brought up to the 24 hour desk area.
18 You're then told by whoever is working the 24 hour desk
19 what cells or holding rooms are available, and they
20 will give you a key, they will open the room for you,
21 you'll be -- you'll place your arrestee inside that
22 holding area, make sure he has no other shoelaces or
23 things like that, strings that he could hurt himself
24 with on his person, take those from his person, put
25 them into a property bag. He's logged onto the log at

Page 43

1 the 24 hour desk by name and the arresting officer's
2 name, and he's asked if he needs to use the washroom,
3 would like anything to drink. This is our procedure.
4 After that, you will go into your office, and you will
5 start processing your reports. Once your reports are
6 processed and approved, he will then be bring --
7 brought over to the 11th district police station for
8 his final fingerprints and photograph, and that's where
9 he's -- he's taken then from that area to court.
10    Q. Okay. Had you ever worked at any other
11 district stations aside from Homan Square?
12    A. I worked in the 25th district, yes.    1:03:04
13    Q. Is the processing of arrestees there
14 different than at Homan Square?
15    A. Just slightly. They have in-house photograph
16 and printing equipment there, so there is -- you don't
17 have to take them anywhere else.
18    Q. Okay. Were you aware that Mr. Rosado was
19 interrogated at Homan Square?
20    A. I don't know if anyone spoke with him. He
21 may have been spoken to.
22    Q. So it's safe to say you were not -- no longer
23 with Mr. Rosado after he --
24    A. I wasn't. That's correct.
25    Q. Okay. Do you know whether Mr. Soliveras was

Page 44

1 interrogated at Homan Square?
2    A. I don't -- I don't know.    1:03:53
3    Q. Did you attend any court proceedings against
4 Mr. Rosado as a result of the September 1st, 2015
5 arrest?
6    A. I don't recall being at court for this case.
7 I may have been, but I don't recall.
8    Q. Okay. So it's safe to say you do not -- you
9 do not recall if you testified in any court proceeding?
10    A. I know I did not testify in the case.
11    Q. Did you personally write any reports,
12 statements, or other type of documents in relation to
13 Mr. Rosado or this case?
14    A. I did not.    1:04:36
15    Q. Did you receive any subpoenas in relation to
16 Mr. Rosado's criminal case as a result of the September
17 1st, 2015 arrest?
18    A. I think I -- I may have been notified one
19 time. I don't know if I had conflicting courts that
20 day and went to the court that I knew I was pertinent
21 to, but I -- I really don't recall, to be honest, if it
22 was more than that.
23    Q. Okay. So -- I have what I'd like to mark as
24 Exhibit 1. Sorry.
25        MS. ROMELFANGER: Thanks.    1:05:24

Page 45

1  Q. The interrogatories. If you could take a
2  second to look through those, and let me know if
3  there's anything you wanted to add or change, and just
4  look up when you are finished, and let me know which
5  number or what page.
6     A. Okay.                              1:09:42
7  Q. Okay. Do you see anything in here that you
8  would like to supplement, or add to, or change?
9     A. No.
10 Q. Okay. If you can turn to page 4 of the
11 Exhibit, interrogatory -- so it starts on page 3,
12 number four, and then the response is on page 4, where
13 it lists -- lists the following lawsuits, the only one
14 would be to add the Allen or the --
15    A. That would be the only one, yes.
16 Q. -- the -- the Allen? Okay. Sorry. Okay.
17 And everything else is -- everything else is accurate,
18 you want to -- you want to change or modify anything
19 else?
20    A. Appears -- appears accurate.         1:10:46
21       MS. HAYWOOD: Okay. Let's see. Okay. Mark
22 this as Exhibit 2. Let me get you a copy. There.
23       MS. ROMELFANGER: Thanks.
24 Q. Okay. Do you recognize this document?    1:11:49
25    A. Yeah, that's a general -- that's a gang

Page 46

1  investigation supplemental report.
2  Q. Okay. Do you recall who filled this out?
3     A. Looks like --
4        MS. ROMELFANGER: Objection. Foundation.
5  You can answer.
6     A. It appears that Officer Mora filled this
7  report out.
8  Q. When this report was filled out, is this
9  filled out solely by Officer Mora, or did you have any
10 -- any collaboration or input?
11    A. I did not.
12 Q. Okay. Okay. So it's fair to say that this
13 investigation would be based solely on Officer Mora's
14 investigation and observations?
15    A. That would be correct.              1:12:34
16 Q. Okay. I just have one final thing. I'm
17 going to play you a video of the arrest of Mr. Rosado,
18 so here we have the -- just for description, this is
19 Defendants' produced documents per -- it's labeled
20 PerpPics, P-e-r-p-P-i-c-s, 214, and then it says,
21 "Rev," R-e-v, "A. Rosado 20000254," for the record.
22       RECORDER: Would you prefer I record the
23 video or keep it on him? I can --
24       MS. HAYWOOD: Keep it on him.         1:13:40
25       RECORDER: Okay. Perfect.

Page 47

1        MS. ROMELFANGER: You just want to say what
2  timestamp we're starting at and ending at --
3        MS. HAYWOOD: Yes, I will be starting at
4  zero, and I will be ending it at -- I will call out the
5  end time when I can --
6        MS. ROMELFANGER: That's fine.        1:14:15
7        MS. HAYWOOD: -- get the chance to do that.
8  Okay.
9        (Video played)
10 Q. So stopping briefly at one -- one minute and
11 30 seconds. Do you recognize the individuals in this
12 video?
13    A. Yes.                               1:16:03
14 Q. Okay. Can you describe for me, based on
15 location-wise, which officer is which and who are the
16 individuals in that video?
17    A. Officer Heyden is approaching Rosado on the
18 driver's side, and myself and Officer Delcid are
19 approaching the passenger's side of the van.
20 Q. Okay. Starting back again at 1:30.
21       (Video played)
22 Q. Stopping at two minutes and 13 seconds. So
23 based on what you've seen from this video, do you know
24 at what point you -- did you observe Officer Heyden
25 procuring drugs from Mr. Rosado's person?

Page 48

1        MS. ROMELFANGER: Objection to the extent
2  that misstates prior testimony. You can answer.
3     A. At that point, I don't think I knew yet.   1:17:35
4  Q. Okay. Starting back up, sorry, at two
5  minutes, 13 seconds.
6        (Video played)
7  Q. Stopping at two minutes, 54 seconds. At this
8  point, can you identify maybe the officers and the
9  individuals in the video and by their location now?
10    A. At the rear of the vehicle, I think, is
11 Officer Heyden with Rosado, and I think that's me
12 walking Soliveras to the back, I think.
13 Q. Okay. Starting back up at two minutes, 54
14 seconds.                                  1:19:14
15       (Video played)
16 Q. Stopping at three minutes, 14 seconds. Can
17 you describe who the -- where the -- the location of
18 the individuals and who are the individuals in the
19 video now?
20    A. I believe Officer Delcid is now walking
21 towards the back of the police vehicle where we're all
22 standing.
23 Q. Starting back up at three minutes, 14
24 seconds.                                  1:20:03
25       (Video played)

Page 49

1  Q. Can you describe the individuals -- at --
2  stopping at three minutes and 42 seconds. Can you
3  describe the individuals in the video and their
4  location?
5  A. Yes, Officer Delcid is back by the van, and I
6  am now positioned by the backseat of the police
7  vehicle.
8  Q. And Officer Heyden?
9  A. Officer Heyden is at the back of the police
10 vehicle with Rosado and Soliveras.
11     MS. HAYWOOD: Okay.
12     MS. ROMELFANGER: Hey Tia, before you start
13 back up, can we take a quick break since there's no
14 question pending? I gotta use the restroom.
15     MS. HAYWOOD: Sure. Sure.            1:21:15
16     RECORDER: Off the record, 11:30 a.m.
17         (Off the record)
18     RECORDER: Back on the record, 11:38 a.m.
19     MS. HAYWOOD: Okay. So just for the record,
20 this is Tia Haywood on behalf of the Plaintiff, Angel
21 Rosado, and we were watching a video, which was
22 described as PerpPics 214, and we are currently stopped
23 at three minutes and 42 seconds into the video.
24  Q. Okay. Playing at three minutes and 42
25 seconds.

Page 50

1         (Video played)
2  Q. Okay. Stopping at four minutes and 13
3  seconds. Can you describe the individuals in the video
4  now and their location?
5  A. Everything is pretty much the same. Officer
6  Delcid is still at the driver's side of the van, I left
7  my vehicle and walked to the passenger's side of the
8  van. Sorry, that --
9  Q. Starting at four minutes and 13 seconds.    1:22:57
10        (Video played)
11 Q. Stopping at four minutes and 58 seconds. Can
12 you describe the individuals and their location and
13 also what they -- what you were doing at that time --
14 at this time in the video, if you recall?
15 A. I think they're all in the same -- all the
16 individuals are still in the same positions as they
17 were. I believe I was in the passenger's side of the
18 vehicle, maybe just looking through the vehicle a
19 little further.
20 Q. Starting back at four minutes and 58 seconds.   1:24:23
21        (Video played)
22 Q. Stopping at seven minutes and 25 seconds. Do
23 you recall the -- can you describe the individuals in
24 the video and their location?
25 A. I'm still on the passenger's side of the

Page 51

1  vehicle, Officer Delcid now walked around to the
2  passenger's side of the vehicle, Officer Heyden is
3  still at the rear of the police vehicle with Soliveras
4  and Rosado.
5  Q. Do you recall what you were doing on the --
6  A. I may have been just looking around inside
7  the interior of the vehicle at that time.
8  Q. Okay. Starting back up at seven minutes and
9  25 seconds.
10        (Video played)
11 A. Did something happen? It's like it's frozen
12 or something.
13 Q. Yeah, just going to pause it at nine minutes
14 and 23 seconds. Starting back at nine minutes and 30
15 seconds.
16        (Video played)
17 Q. Stopping at ten minutes and four seconds.
18 Can you describe the individuals and their location?
19 A. I walked over to the police vehicle, to the
20 driver's side rear door, and Officer Delcid is on the
21 driver's side of the van.
22 Q. Do you recall why you were -- why you went to
23 your police vehicle?
24 A. I could only tell you I think I went there, I
25 may have been using our two-way radio to update

Page 52

1  surveillance officers of what was taking place.
2      MS. ROMELFANGER: And can we just establish
3  for the record that there's actually two videos on
4  here, the left appears to be the original, and the
5  right appears to be an enhanced version of the original
6  just --
7      MS. HAYWOOD: Yes.                      1:31:29
8      MS. ROMELFANGER: -- for the record?
9  Q. Starting back up at ten minutes and four
10 seconds.
11        (Video played)
12 Q. Stopping at ten minutes and 23 seconds. Can
13 you describe the individuals and their location?
14 A. Officer Heyden is still at the back of the
15 police vehicle with Rosado and Soliveras, Officer
16 Delcid is at the driver's side door, and I walked
17 around to the passenger's side of the van.
18 Q. Starting back at ten minutes and 23 seconds.   1:32:21
19        (Video played)
20 Q. Stopping at ten minutes and 38 seconds. Can
21 you describe your -- your location and what you were
22 doing, if you recall?
23 A. I can't see on the -- I was -- I'm sorry, I
24 was paying attention to your enhanced version. I'm
25 trying to see where I actually look like I'm -- on the

Page 53

1  video right now.  I still believe I'm on the
2  passenger's side of the van outside.  I may have been
3  looking for an address over there.  I don't know.
4      Q.  Okay.  Starting back up at ten minutes and 38
5  seconds.
6          (Video played)
7      A.  It's hard to tell -- fuzzy.            1:33:29
8      Q.  Stopping at 14 minutes and 32 seconds.  Can
9  you describe the individuals and their location?
10     A.  Officer Heyden is still at the back of the
11 police vehicle with Rosado and Soliveras, Officer
12 Delcid walked away from the driver's side of the van
13 around to the passenger's side of the van.
14     Q.  And your location?                     1:37:25
15     A.  I have to be on the passenger's side of the
16 van somewhere.  It's hard to see on this video though.
17     Q.  Okay.  Do you recall if you had any
18 conversations with Officer Delcid when he was -- when
19 you guys are conducting this search of the van?
20     A.  I'm sure we spoke to each other.  I don't
21 know to what extent.
22     Q.  Starting at 14 minutes and 32 seconds.  1:37:58
23         (Video played)
24     Q.  Stopping at 15 minutes and 45 seconds.  Can
25 you describe the individuals and their location?

Page 54

1      A.  Officer Delcid is standing at the rear of the
2  van, I walked from the passenger's side of the van over
3  towards Rosado, Soliveras, and Officer Heyden at the
4  back of the police vehicle.
5      Q.  Do you recall if there was any conversations,
6  at this point, in the search of Mr. Rosado and
7  Soliveras?
8      A.  At that -- I couldn't tell you at what point
9  there were conversations.
10     Q.  Okay.  Starting at 15 minutes and 45 seconds.  1:39:54
11         (Video played)
12     Q.  Stopping at 16 minutes, 37 seconds.  Can you
13 describe the individuals and their location?
14     A.  Sure.  I walked away from Rosado, Soliveras,
15 and Officer Heyden, appeared like I may have had
16 something in my hand, maybe an ID or something, and
17 went to my vehicle to the driver's seat, and Officer
18 Delcid walked around the police vehicle towards the
19 front of the vehicle.
20     Q.  Okay.  Starting at 16 minutes, 37 seconds.  1:41:27
21         (Video played)
22     Q.  Can you describe the individuals and their
23 location?                                      1:44:06
24     A.  Yeah, I exit --
25     Q.  Stopping -- sorry, this is for the record.

Page 55

1  Stopping at 19 -- 19 minutes and 12 seconds.  You can
2  go ahead, I apologize.
3      A.  I exit my vehicle, and I walked towards the
4  rear of the police vehicle, and then I walked away from
5  the police vehicle back to the driver's side of the
6  van.
7      Q.  And do you -- can you describe where Officer
8  Delcid is at this time?
9      A.  I believe he's still on the passenger's side
10 of the police vehicle, I think.
11     Q.  Okay.  And Heyden?
12     A.  Heyden is still at the rear of the vehicle
13 with Rosado and Soliveras.
14     Q.  Okay.  And do you recall why you went from
15 the police vehicle to the van, if you can remember?
16     A.  I -- I don't recall why.               1:45:09
17     Q.  Okay.  Starting at 19 minutes and 12 seconds.
18         (Video played)
19     Q.  Stopping at 21:26.  Can you describe the
20 individuals and their location?
21     A.  Yeah, several minutes prior to that, I had
22 walked from the van back to the rear of the police
23 vehicle, Officer Delcid walked from the passenger's
24 side of the van over to the police vehicle.  Currently
25 right now, at this time, I am standing with Rosado and

Page 56

1  Soliveras at the back of my police vehicle, Officer
2  Delcid is sitting in the driver's seat of the police
3  vehicle, and Officer Heyden walked over towards the
4  van.
5      Q.  Okay.  And do you recall any conversations at
6  that point that might have been had between you, the
7  other officers, and Alexander Soliveras or Rosado at
8  this point?
9      A.  I don't recall exact conversations at that
10 point.                                         1:48:38
11     Q.  Do you recall what you were doing, why you
12 went from the police vehicle to the rear of the -- to
13 the van and back to the rear of the police vehicle, if
14 I described that correctly --
15     A.  I can only -- I can only think it appeared
16 like I was holding some sort of form of identification
17 in his car, and then I ran his identification, maybe it
18 wasn't coming back.  I don't know, maybe I went to the
19 van to look for maybe other identification if -- in
20 case he was giving a different name or something like
21 that.
22     Q.  Okay.  So that would be it for this vehicle.
23 I just have a couple more questions, and then you will
24 be free to go.  So just to clarify, you didn't find
25 anything from the van, any drugs or narcotics, correct?

Page 57

1  A. I never recovered any drugs or narcotics in
2 this arrest.
3  Q. And as you testified earlier, the only time
4 you seen the drugs was at the station. Is that
5 correct?
6  A. I believe that's when I first saw the drugs,
7 yes.                                    1:50:03
8  Q. But you do not recall what type of drugs were
9 recovered, or do you?
10  A. I believe it was cocaine -- powder -- I think
11 it was powder cocaine and a small amount of cannabis.
12  Q. Okay. And if you were to -- if you observed
13 hand to hand transaction -- strike that. In the -- if
14 you observed a drug transaction, and you approached the
15 suspect, and you identified the drugs, would you leave
16 the drugs -- what would be the process you would follow
17 after that to secure the drugs?
18     MS. ROMELFANGER: Objection to form. You can
19 answer.                                 1:51:00
20  A. I think if you see the drugs, you recover the
21 drugs, you maintain constant control of the drugs for
22 the chain of custody purposes until you would go into
23 your office and inventory those drugs, at which time,
24 they're placed into a safe.
25  Q. And what kind of safe is this that the drugs

Page 58

1 are placed into?
2  A. I don't know how to describe it. They're
3 about maybe three and a half feet tall, they have,
4 like, a rotating door that only items could drop
5 through and cannot be retrieved through.
6  Q. And where is the location of this safe? 1:51:53
7  A. In our office, it's -- I guess any police
8 station, they're always behind the desk.
9  Q. And who would have access to this safe?
10  A. Any patrol officer who seizes any type of
11 contraband would be able to drop the contents into the
12 safe, whatever type of narcotics it is that would fit
13 in that safe, and then evidence recovered property
14 section comes, and they -- they pick that up to be
15 transported to the lab.
16  Q. Could any patrol officer retrieve any of the
17 narcotics from the safe?
18  A. Not that I'm aware of.                1:52:38
19  Q. And are you aware whether you or any of the
20 other officers, meaning Mora, Heyden, Delcid, or -- I
21 said Mora -- Mora, Heyden, Delcid, or yourself, did you
22 do any drug raids or execute any search warrants prior
23 to September 1st, 2015?
24  A. Well that's a -- that's a big question, but
25 I'm -- I'm sure we did. I mean, that's what we -- we

Page 59

1 do.
2  Q. How about a week before?
3  A. I couldn't tell you that. I'd have to look
4 at our history of what we did.
5  Q. But -- so okay. But you testified earlier
6 that the most common search -- the most common warrant
7 -- search warrants you get are related to drugs. Is
8 that correct?
9  A. I think -- I think I said about 50 percent,
10 somewhere in that range.
11  Q. Okay.                                1:53:51
12  A. You know, I -- we do search warrants for guns
13 as well.
14     MS. HAYWOOD: Okay. Okay. Nothing further.
15            EXAMINATION
16 BY MS. ROMELFANGER:
17  Q. Okay. I just have a couple quick follow-ups.
18 Officer Korhonen, do you recall earlier Ms. Haywood
19 asking you a series of questions about the probable
20 cause that you -- that the officers had to arrest Angel
21 Rosado in this case?
22  A. Yes.
23  Q. Okay. And you testified earlier that the
24 probable cause was based on Officer Heyden's recovery
25 of drugs off of Angel Rosado's person, correct?

Page 60

1  A. Partially, yes.
2  Q. Okay. And earlier that day, prior to Angel
3 Rosado's arrest, you were working enforcement with
4 Officers Heyden and Delcid, right?
5  A. That's correct.                      1:54:53
6  Q. Okay. At some point, did Officer Abraham
7 Mora come over the car to car?
8  A. Yes.
9  Q. Okay. And when he came over the car to car,
10 do you recall what was said, not -- maybe not the
11 specifics, but generally speaking, what was said by
12 Officer Mora?
13  A. Somewhat. I remember he -- he was on
14 surveillance, watching something he had information on,
15 and observed what he believed was a hand to hand
16 narcotics transaction.
17  Q. Okay. And after Abraham Mora said he saw
18 this -- strike that. After Abraham Mora said he saw
19 this hand to hand transaction, what occurred after
20 that?
21  A. He asked us if we were anywhere close or if
22 we could start coming in his direction to further
23 investigate his observations.
24  Q. Okay. And is that what happened?
25  A. Yes.                                 1:55:48

Page 61

1  Q. Okay. At some point -- strike that. At some
2 point, did the hand -- strike that. At some point, did
3 you find out that the hand to hand transaction viewed
4 by Officer Mora was -- strike that. That's also a bad
5 question. At some point, did you find -- later find
6 out that Angel Rosado was the one Abraham Mora viewed
7 in the hand to hand transaction?
8  A. Yes.
9  Q. Okay. Would that information from Abraham
10 Mora also go into the probable cause analysis of
11 whether or not there was probable cause to arrest Angel
12 Rosado?
13  A. Absolutely.
14  Q. Okay. Generally speaking, are you allowed to
15 rely on information you receive from other officers?
16  A. Yes.
17    MS. ROMELFANGER: Okay. That's all I have.
18         EXAMINATION
19 BY MS. HAYWOOD:
20  Q. Just brief follow-up. So you talked about
21 the probable cause being based on partly Heyden's
22 retrieval of the drugs and other partly Mora's
23 description of a hand to hand transaction. Is that
24 fair to say?
25  A. Yes.

Page 62

1  Q. So is that the full basis of the probable
2 cause to arrest Mr. Rosado?
3  A. I don't -- I couldn't tell you what Officer
4 Mora's exact information was that led him to there, but
5 that would be all part of the things that would lead up
6 to us investigating, which eventually led to us
7 investigating and stopping Mr. Rosado.
8  Q. Okay. So is -- does investigation include
9 handcuffing an individual?
10    MS. ROMELFANGER: Objection to form. You can
11 answer.
12  A. A lot of times for officer's safety.    1:57:46
13  Q. Okay. Okay. And so just -- I'm just trying
14 to clarify. The probable cause is based on -- partly
15 on Heyden's retrieval of the drug, partly on the hand
16 to hand transaction described by Mora. Is there any
17 other basis for the probable cause that you personally
18 had?
19  A. I wasn't the surveillance in this, but the
20 surveillance and the information that led to the
21 surveillance, along with the stop, and then I guess,
22 the investigation that Officer Heyden conducted with
23 Mr. Rosado initially, which led to the recovery of the
24 narcotics, yes, that would all be probable cause.
25  Q. Okay. And what about the probable cause for

Page 63

1 Mr. Soliveras' arrest?
2    MS. ROMELFANGER: I'm going to object to form
3 and to the extent that calls for a legal conclusion.
4 You can answer.
5  A. I think we were just investigating his name
6 and conduct a name check of him, and nothing was coming
7 back or -- or something to that nature. If you're in
8 the vehicle, we would -- we would conduct that
9 investigation.
10  Q. Okay. And the last -- the last question I
11 have was you mentioned earlier about how Mora had
12 observed the hand to hand transaction, that he was
13 describing it to the team. Is that fair to say, he was
14 describing it to the team?
15  A. Yeah, I would -- I would say that, yes.    1:59:34
16  Q. Okay. So he was describing it to the team,
17 and they said -- he asked if you guys could come in his
18 direction, do you recall which -- what direction that
19 was?
20  A. Well to the area of Diversey and Monticello,
21 I guess, is where he was.
22  Q. And you guys proceeded to go to Diversey and
23 Monticello?
24  A. Yes, from afar. Yes.
25  Q. And then when did you change course to go to

Page 64

1 47th and South Wallace?
2  A. When they -- Mr. Rosado entered his vehicle
3 and started to move, that was the location that it was.
4 Eventually, we were able to catch up to them,
5 surveillance officers, that is.
6  Q. Okay. And then how did you -- how did you
7 become aware that Mr. Rosado started to move?
8  A. Through our -- our two-way radios.    2:00:31
9  Q. Sorry. I'm sorry, can you repeat that?
10  A. Through our two-way radios.
11  Q. Okay. Two-way radio. And in your line of
12 work, is it typical that you will go from when you're
13 doing surveillance and surveillance is noted at one
14 direction, that you would go to another direction, like
15 in this case, from north to south?
16  A. Surveillances can go any direction. We --
17 we've gone all over the city just doing surveillances.
18 So yeah, it -- it is a common thing that can happen.
19  Q. And you testified earlier that, upon
20 surveillance, if you were -- if you were conducting
21 surveillance of a -- well I'll ask you, if you were
22 conducting surveillance of a drug -- drug transaction,
23 you noticed a hand to hand, what would be the next
24 steps that you would take?
25    MS. ROMELFANGER: Objection to form. Asked

Page 65

1 and answered. You can answer.
2   A. I think every investigation is different.
3 Sometimes, you know, you act on that information as
4 fast as you can, sometimes you act on those things over
5 a short period of time. So it -- it all depends on
6 what -- what type of investigation you're working at
7 that time.
8       MS. HAYWOOD: Okay. Nothing further.
9       MS. ROMELFANGER: I have nothing. We'll
10 reserve.
11       RECORDER: Uh-huh. Off the record, 12:18
12 p.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 66

1       CERTIFICATION
2   I certify that the foregoing is a correct
3   transcript from the record of proceedings
4       in the above-entitled matter.
5
6
7       Brenda L Portillo
8       April 5, 2018
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25